Filed 6/17/13  In re T.B. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re T.B. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>       Plaintiff and Respondent,<br><br>v.<br><br>T.Y.,<br><br>       Defendant and Appellant. | A136182<br><br>(Alameda County<br> Super. Ct. No. OJ12018490) |

T.Y. (Father), father of 14-year-old T.B. and 5-year-old M.Y., appeals from the juvenile court's order on reconsideration denying reunification services to him.  He contends the court:  (1) lacked the power to reconsider its dispositional order granting services to him; (2) erred by considering, upon reconsideration, an additional allegation that had not been previously pled; (3) erred in failing to determine whether it was in M.Y.'s best interest to award reunification services to Father; and (4) violated his equal protection rights by granting services to the children's mother (Mother), but not to him. We reject the contentions and affirm the order.

**FACTUAL AND PROCEDURAL BACKGROUND**

An original petition was filed February 29, 2012, alleging Father punched T.B. in the face and stomach, pushed him to the ground, and made him eat an onion and garlic as a form of discipline.  Two days later, Father slapped T.B. across the face, punched him in

1

the stomach, grabbed T.B.'s head and slammed it into the freezer door, then punched him in the stomach again, causing T.B. to lose his breath. T.B. was fearful of returning home to live with Father. There was a substantial risk that T.B.'s younger brother, M.Y.—who had witnessed some of the abuse—had also been abused. The children had no provision for support, as Father was in custody on felony charges of willful harm or injury to a child and corporal punishment or injury to a child, and Mother, who had lost physical custody of the children in May 2011, was not capable of providing full time care for them at the time.

According to the detention report, the children were placed in their great maternal aunt and uncle's home. There was a prior dependency petition from Contra Costa County filed July 10, 2010, in which it was alleged that Mother grabbed T.B. by his face and neck, stomped on him, and banged his head against a wall, causing T.B. to suffer a seizure and be airlifted to a hospital for immediate medical attention. Mother also kicked T.B. out of the home in only his boxer shorts and a t-shirt, and cursed at him that she did not want him. Further, T.B.'s parents were involved in a domestic violence incident in August 2009 that resulted in Father being arrested for spousal battery and false imprisonment. Another dependency petition filed in Contra Costa County on July 15, 2010 alleged M.Y. was at risk because of the abuse against T.B. The petitions were sustained on the abuse and neglect allegations.[1]

In an interview with the Alameda County Social Services Agency (Agency), T.B. provided details of the incidents that led to the filing of the instant petition. He added that Father also hits M.Y. and that he and M.Y. are afraid of Father and often flinch when he makes movements. M.Y. reported that Father hit T.B. and also "whopped [T.B.] with a belt." Father denied the allegations and told police that T.B. is a liar who had also lied about Mother hitting him. When reminded that T.B. was hospitalized from being hit by Mother, Father responded that T.B. had "faked" the seizure. Mother, who participated in

---

[1] Mother was convicted of child cruelty charges and was restricted from having physical custody of the children. She was sentenced to four years probation and 365 days in jail. She was released December 9, 2011.

2

a team decision making meeting, said she wanted to reunify with the children. She acknowledged she was unable to do so right away and said she was taking parenting classes, attending college, and working towards obtaining a stable living environment. The court detained the children, who were ordered to remain in their relatives' home.

The Agency reported in a jurisdiction/disposition report that the children were doing well. T.B. did not want to live with Father and wanted to live with Mother, or with an aunt in Stockton if he could not be with Mother. The district attorney's office reported that Father was being charged with felony child abuse. The police department reported that a felony count had been added for M.Y. and that "video evidence of [T.B.] being forced to eat an onion" had been discovered. The Agency recommended that Father receive no reunification services, stating: "The father has a significant criminal history that dates back to August 8, 1989 that includes convictions of kidnapping, false imprisonment with violence, and battery of cohabitating partner in March 3, 2009 in Contra Costa County . . . Additionally, the severity of the physical and emotional abuse of the minors by the father in this current situation indicates that he did not incorporate the domestic violence and/or parent training skills he should have learned from the previous Family Reunification Services offered through Contra Costa County."

According to a police report, which was attached to the jurisdiction/disposition report, T.B. told police that when he returned home from school on February 24, 2012, Father walked towards him and "socked him dead in the chest." T.B. could not speak. Father then picked T.B. up and "threw him across the things" and hit him "more and more" as T.B. backed up. T.B. fell to the floor and Father hit him with his knuckle in T.B.'s lip, causing it to swell up. That evening, Father told T.B. to eat an onion and garlic for dinner as punishment for lying about his homework. T.B.'s tongue and throat became swollen from eating the onion and garlic. Two days later, Father became mad at T.B. for not cleaning up some food. Father slapped T.B. across the face, causing T.B. to fall. When T.B. got up, Father hit him in the stomach, then hit him again. The hits to the stomach were "straight punches," and T.B. could not breathe. Father then opened the freezer door and slammed T.B.'s head against the freezer door, causing the door to hit the

wall, then close. T.B. tried to get away but Father punched him in the stomach again. The police officer noted T.B. was "very consistent" in what he reported.

According to the police report, Father's housemates, who had witnessed some of the abuse, stated they did not want to make a police report but that they would "come forward" if necessary. One housemate stated that when she came home, she noticed T.B.'s lip was bleeding. She asked T.B. what happened and he said he had a toothache. When she returned that afternoon, she saw T.B. doing his homework. Father asked if T.B. was done, and when T.B. responded he was not, Father "smacked him twice in the back of the head. The smacks were loud and almost knocked [T.B.'s] head to the table." Father said if T.B. did not finish his homework, he was going to "take him outside, drag him up and down the street and beat the shit out of him." Later that day, the housemate saw Father cut an onion and give half to T.B. Father made T.B. eat the onion for dinner while lecturing him about how lucky he was to not be in foster care. T.B. "was crying and then threw up on the floor and [Father] made him mop it up."

Another housemate reported that as soon as T.B. came home from school and walked in the door, Father started " 'firing' " on T.B., who was backed up against a corner as Father "was just hitting him, punching him with his fists all over his body." T.B. "knew how to protect himself, luckily." Father punched T.B. "maybe about 10 times, then went into [a] room and came back out and started punching him more." T.B. cried as Father called him " 'bitches,' " and Father told T.B. that he (Father) was "only there so the kids don't have to be in foster care." T.B. was on the floor and Father "was standing over him just punching him, calling him bitches." The housemate left with her child, and when she returned, she saw T.B. eating an onion. Father came out and said, "you still eating the onion." Father "slapped [T.B.] with an open hand" and told him he would have to eat another onion since he was not done with the first. As T.B. ate the onion, M.Y. said, "don't do that," to which Father responded by smacking M.Y. in the mouth and saying, " 'Stay the fuck out [of] his business.' " M.Y. cried out in pain. The housemate then saw T.B. run towards the bathroom and throw up the onion. Father said, "what did I tell you if you threw it up," and T.B. responded, "I need to lick it up."

4

Father saw the housemates looking so he allowed T.B. to mop it up, but when T.B. was "not doing it [mopping it up] fast enough," Father "started hitting him again." Father "punched [T.B.] dead in the chest, and [T.B.] just crumbled to the floor." T.B. was "punched on all over the body again" for not finishing the onion, and it was as if Father was "fighting a grown man."[2] The housemate was scared to say anything, as Father was violent and always blamed the children.

According to the second housemate, Father had been sexually and physically abused and did "weird" things. On one occasion, when the housemate's son asked Father for an Icee bar, Father put the bar to his groin and said, "you want some ok come get it." On another occasion, when M.Y. said that Father "moon[ed]" him all the time, i.e., pulled his pants down at him, Father told M.Y. to be quiet and said, "I do not do that." M.Y. responded, "no you don't." The housemate regretted having left her child with Father on two occasions while she was at work, and also felt sorry for Father's children. Police recovered a five and a half minute video from Father's cell phone showing T.B. eating a white onion while Father made references to posting the video on the internet.

The Agency filed an addendum report on May 29, 2012, in which it recommended reunification services to Mother, but not to Father because he had been "convicted of a violent felony." According to the report, Father had entered a plea to one count of corporal punishment or injury to a child (Pen. Code, § 273d, subd. (a)) and had been sentenced to five years felony probation, with a stay away order against him protecting T.B. The children were still living with their relatives and had "settled in." The great uncle reported one major incident in which he found M.Y. and the great uncle's two-year-old grandson, who was visiting, under M.Y.'s bed, naked. Everyone was upset and the great uncle, who felt responsible for the incident, said he was watching M.Y. more closely. Mother was visiting the children regularly and was outside the great uncle's house supervising T.B. and other children when the incident with M.Y. occurred. When she asked M.Y., "[w]hy did you take off your pants?" M.Y. initially said he did not want

---

[2] According to the police report, Father was 6 feet tall and 210 pounds at the time of the incident. T.B. was 5 feet 4 inches tall and 110 pounds.

to talk about it, but when she told him he was not in trouble and that she loved him, M.Y. responded he was "doing nasty stuff with [the grandson]." Mother was very upset and said the incident "increased her urgency for wanting to care for her own children."

At a contested jurisdictional and dispositional hearing on June 13, 2012, Father testified he was convicted of false imprisonment in 2009 based on a guilty plea, but was never convicted of kidnapping. He said he physically disciplined T.B. when T.B. was "a little younger" but stopped doing so after the Agency became involved in 2006 and told him he could not use physical discipline. On February 24, 2011, Father received a call from T.B.'s school that T.B. was being sent home early to finish his homework. When T.B. came home, Father had T.B. do the dishes and finish his homework. Father also told T.B. to eat an onion, and T.B. was "tearing up" from eating it. After he had eaten about three-quarters of the onion, T.B. ran towards the bathroom and vomited. Father said he did not make T.B. eat any garlic. He did take apart a garlic to use in preparing dinner, and T.B. asked, " 'You want me to eat the garlic, too?' " Father told him, " 'No, man, keep eating the onion.' "

Father testified that T.B. had the option of not eating the onion if he did not want to. If T.B. had told Father he did not want to eat the onion, Father would have asked him what T.B. thought would be an appropriate alternative form of punishment. Father testified that he in fact had a conversation with T.B. about eating an onion prior to the day he made him eat it, and they had agreed, "man to man," that the next time Father received a call from school, T.B. would eat an onion as punishment. Father had previously made T.B. eat an onion as a form of punishment, in 2006. He regretted having done so and did not do it to hurt T.B.

Father testified he did not physically discipline T.B. at all on February 24, 2012. He was aware T.B. had reported that Father punched him in the chest repeatedly, but Father believed T.B. was lying in order to "sabotage [their] relationship" so that he could go back to living with Mother. When asked whether he saw the wound on T.B.'s lip, Father responded, "I walked in the kitchen while he's doing the dishes, and he's poking himself in the lip with a knife." Father did not take T.B. to see a doctor for the lip injury.

6

Father testified that two days later, on February 26, 2012, he "gave [T.B.] a pop in the back of the head" after M.Y. came crying to him and said that T.B. had hit him. Father did not "strike" T.B. but rather, gave him a "playful pop in the back of the head." T.B., who was sitting at a table, slammed his hands on the table and pressed his head towards the table as a "dramatic gesture." Father told him, "stop messing around, dude, you are trying to make it seem like I'm doing something to you." T.B. suffered no physical injuries. T.B. left the house about an hour after the incident.

During a break in Father's testimony, T.B., who had been present in court observing the proceedings, stated through his attorney that he wanted to excuse himself. He was "quite emotional after [Father's morning testimony]" and "was ready to go home." T.B. also asked to give Father a hug before he left, and the court granted the request.

At the end of the hearing, the court found Father had inflicted severe physical harm to T.B. on multiple occasions and that there was a history of abuse that went back to 2006. The court stated, "this is one of the most outrageous, severe, cruel, vicious attacks on any child that I have seen and read about. The problem I'm having and what I'm struggling with is I cannot make the finding that it would not benefit [T.B.] to pursue reunification services with the offending parent, you. I'm struggling with that. And that's the way I'm going to now find that the bypass does not apply to you, not because of you – because you are vicious, but because I think that your son needs you in his own way, and that was demonstrated quite touchingly at the end of the last hearing where he asked to hug you and the deputy did allow that to occur. That's just one demonstration of it. So with great reluctance, I don't find a bypass." Agency's counsel argued it would not be in T.B.'s best interest to visit Father in jail or to have unsupervised phone calls with Father. Counsel added, "in terms of reunifying or . . . rebuilding the relationship between the father and the minor[,] that should be done in view of [T.B.'s] case plan, not so much in terms of services to the father because he didn't present any evidence to support avoiding the bypass." The court stated it "generally agree[d]" with counsel's statements.

Minors' counsel stated he was "a little uncomfortable with the court's ruling" because "[i]f the court finds that [Welfare and Institutions Code section] 361.5(b)(6) [bypass of reunification services] does apply, the burden shifts to the father to show that reunification services would be in the minor's best interest, and I don't think that there is much of a case that was made by the father that reunification services would be in the best interest." He added that T.B. did not want to live with Father and was more focused on reunifying with Mother. Agency's counsel stated she was concerned about "the message [to T.B.] in terms of the court not allowing the bypass of services and yet again [T.B.] having to go through the process of knowing [that] the goal is [to reunify with Father]." She stated, "[T.B.] will hug his father. He still cares about his father, but he was horribly abused by his father, and frankly, I think that disqualifies the father [from] the opportunity to say I will still be here, you need to work with me." The court stated it had made its ruling and that it was open to motions for reconsideration. When minors' counsel reiterated that Father had not met his burden of showing, by clear and convincing evidence, that reunification services would be in T.B.'s best interest, the court stated, "I am not necessarily inviting a motion to reconsider, but if there is a motion to reconsider it, I will consider the motion to reconsider. That's all I can say. Unfortunately, we are so strapped with time around here that decisions have to be made quickly and expeditiously with in-custody parents [who have] to get on buses, et cetera."

On the issue of amendments to the petition, Father's counsel indicated he had no objection to the language originally proposed by the Agency on Welfare and Institutions Code section 300, subdivisions (a) [father's conviction for serious physical harm to T.B] and (g) [no provision for support].[3] He objected to the adding of subdivision (i) regarding severe physical harm on the ground that he had no notice or opportunity to address the issue so that it would be "a little unfair." Agency's counsel responded that it was an amendment to conform to proof. The court allowed the amendments relating to

---

[3] Agency's counsel stated at the outset of the hearing that she had provided all counsel with proposed changes to the petition and stated she will "ask to conform to proof at the end."

8

subdivisions (a) and (g) but stated it was not prepared to make a finding under subdivision (i).  The court found T.B. was a dependent as described by subdivisions (a) and (g) and that M.Y. was a dependent as described by subdivisions (g) and (j) [abuse or neglect of sibling], and granted reunification services to both parents.

On June 22, 2012, the Agency filed a request for reconsideration of the court's orders declining to find jurisdiction under subdivision (i) and awarding reunification services to Father.  Father opposed the motion.  The court granted reconsideration on July 27, 2012, stating there existed a "new circumstance" in that the court had had "proper opportunity to reflect on the evidence adduced at the June 13, 2012 hearing without the severe time constraints and movement between courtrooms (to accommodate the incarcerated father)."  The court sated, "Upon reconsideration the Court finds that ample evidence was admitted to find the 'act or acts of cruelty' set forth in . . . section 300(i); and the Court further finds that the [Agency] presented sufficient evidence for a finding of 'infliction of severe physical harm to the child' as delineated in [section] 361.5(b)(6).  In fact, the Court finds that the father's vicious actions perpetrated against the child amounted to torture.  The Court was unduly affected and influenced by the hug given by the child to the father at the conclusion of the June 13, 2012 hearing. Virtually every child loves [his or her] parents despite the most cruel abuse and neglect." The court vacated its prior orders denying a finding under section 300, subdivision (i), and awarding reunification services to Father.  The court issued a new order finding the section 300, subdivision (i), allegation to be true and denying reunification services to Father under section 361.5, subdivision (b)(6) [bypass of services when a parent causes a child to suffer severe physical harm].

## DISCUSSION

### *Power to Reconsider Dispositional Order*

Father contends the court lacked the power to reconsider its dispositional order granting services to him.  We disagree.

9

Welfare and Institutions Code[4] section 385 provides: "Any order made by the court in the case of any person subject to its jurisdiction may at any time be changed, modified, or set aside, as the judge deems meet and proper, subject to such procedural requirements as are imposed by this article." The court in *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92 (*Nickolas F.*) addressed the statute's relationship to the inherent powers of the juvenile court and held that a juvenile court has authority under section 385 to modify its prior orders sua sponte, as long as it provides the parties with notice and an opportunity to be heard. (*Nickolas F.*, *supra*, 144 Cal.App.4th at p. 98.) "The juvenile court's authority to modify a previous order that the court independently recognizes as having been erroneously, inadvertently or improvidently made is not contingent on a party seeking a modification pursuant to section 388," which requires a showing of new evidence or changed circumstances. (*Nickolas F*., *supra*, 144 Cal.App.4th at pp. 98-99; see also § 388.)

In *Nickolas F*., the juvenile court awarded reunification services to the father of two minors even though there was information in the disposition report that the father was incarcerated for having abused the minors' paternal half bother. (*Id*. at pp. 99-100.) The Agency was unable to get in touch with the father, who was in custody, and did not provide services to him. (*Id*. at p. 101-102.) Later, the Agency learned the father's abuse of the half brother had been far more egregious than previously believed. (*Id*. at p. 101.) The Agency recommended that reunification services be terminated, and the father objected on the ground that no services had been provided to him despite the dispositional order requiring them. (*Id*. at pp. 101-102.) The juvenile court, realizing the evidence presented at the dispositional hearing, although minimal, was sufficient to put it on notice that it should not issue a routine order for reunification services, asked the parties to seek modification under section 388. (*Id*. at p. 109.) The Agency filed a section 388 petition alleging that the "new evidence" regarding the exact nature of the father's crime and the length of his incarceration warranted modification. (*Id*. at p. 102.)

---

[4] All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

10

The juvenile court agreed and modified its dispositional order to deny reunification services to the father and set a permanency hearing. (*Id*. at p. 103.)

On writ review, the Court of Appeal held the juvenile court was not authorized to modify its prior order under section 388 because the details relating to the father's crime was not "new evidence," but further held the error was harmless because the result would have been the same had the juvenile court modified its prior orders under section 385 or the California Constitution, article VI, section 1. (*Nickolas F*., *supra*, 144 Cal.App.4th at pp. 106-110.) In rejecting the father's position that a juvenile court lacks authority under section 385 to correct its prior orders sua sponte without a showing of changed circumstances, the Court of Appeal held: "Under [the father's] reading, if a juvenile court realizes that it has misapplied the law, or that the court's processes have otherwise been deficient, the court ' " 'is prohibited from revisiting its ruling . . . no matter how obvious its error or how draconian the effects of its misstep." ' " [Citation.]" (*Id*. at p. 115.) "If section 385 were interpreted to limit the court's ability to reconsider its own ruling, it would violate the separation of powers doctrine embodied in the California Constitution [citation] and would leave the juvenile court without any statutory authority by which to correct its own errors on its own motion." (*Ibid*.)

The reasoning of *Nickolas F*. applies in the instant case. As in *Nickolas F*., the juvenile court here was unaware that it had the power to revisit its dispositional order sua sponte. It therefore invited the parties to file a motion for reconsideration and, in granting reconsideration, stated there existed a "new circumstance" in that the court had had "proper opportunity to reflect on the evidence." Although it is questionable whether a court's "proper opportunity to reflect on the evidence" is a "new circumstance" warranting reconsideration, any error in that regard was harmless because no new evidence or circumstance was needed for the court to modify its order; the court was empowered by section 385 and its inherent powers under the Constitution to reach the same result. (See *Nickolas F*., *supra*, 144 Cal.App.4th at pp. 106-110.) The court's order upon reconsideration shows it recognized it had erroneously or improvidently issued a dispositional order without due consideration and under time constraints because of its

11

belief that Father had to be transported back to jail. The court also recognized it was unduly influenced by—and gave too much weight to—T.B.'s request to hug his father. The parties had notice and an opportunity to be heard on the motion for reconsideration, and Father opposed the motion. Under these circumstances, the court was authorized to reconsider its initial dispositional order.

### *Additional Allegation*

Father contends the court erred by considering, upon reconsideration, an additional allegation of severe physical harm under section 361.5, subdivision (i), that the Agency had not previously pled.[5] Code of Civil Procedure sections 469 and 470, however, allow amendments to conform to proof where the variance is not material; and even where the variance is material, the court may still allow amendment upon such terms as may be just. Section 348 provides that the statutes "relating to variance and amendment of pleadings in civil actions shall apply to [juvenile dependency] petitions and proceedings . . . to the same extent and with the same effect as if proceedings under this chapter were civil actions." (See also *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1041.) Amendments to conform to proof "are favored, and should not be denied unless the pleading as drafted

---

[5] Section 361.5, subdivision (b)(6), provides in part that reunification may be denied to a parent who has inflicted "severe physical harm to the child" and "the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent . . . ." "A finding of the infliction of severe physical harm . . . may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body or the body of a sibling . . . of the child by an act or omission of the parent . . . ; . . . or any other torturous act or omission that would be reasonably understood to cause serious emotional damage." (*Ibid*.) Subdivision (i) provides, "In determining whether reunification services will benefit the child pursuant to paragraph (6) or (7) of subdivision (b), the court shall consider any information it deems relevant, including the following factors: [¶] (1) The specific act or omission comprising the . . . severe physical harm inflicted on the child or the child's sibling or half sibling. [¶] (2) The circumstances under which the abuse or harm was inflicted on the child or the child's sibling . . . . [¶] (3) The severity of the emotional trauma suffered by the child or the child's sibling . . . . [¶] (4) Any history of abuse of other children by the offending parent . . . . [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent . . . within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent . . . ."

prior to the proposed amendment would have misled the adversarial party to its prejudice." (*Id.* at p. 1042.)

Here, the pleading as drafted prior to the proposed amendment described the same facts that led to the filing of the petition against Father, i.e., his acts of violence perpetrated against T.B. on or about February 24 and 26, 2012. In fact, the enumeration and description of Father's acts under subdivision (i) were exactly the same as those stated in the allegations under subdivision (a) in the previous petitions. Father therefore had notice of the facts underlying all of the allegations, including the new allegation under subdivision (i), and had the opportunity to defend them. He in fact defended against those allegations by arguing, for example, that T.B. suffered no physical harm and that any physical abuse was not egregious. He took the stand and denied he physically disciplined T.B., testifying that the worst he did was to give him a "playful pop" in the head, and give him the option of eating an onion as a form of discipline. Because there was sufficient notice to Father and no prejudice has been shown, the court did not err in allowing the Agency to amend the petition to conform to proof.

### *M.Y.'s Best Interests*

Father contends the juvenile court erred in failing to determine whether it was in M.Y.'s best interest to award reunification services to Father. He asserts, "Notably, no one at the time of the adjudication argued, nor did the court consider the reunification issues as to [M.Y.]." He states, "There was no finding in the record nor any reason articulated why [M.Y.], who was differently situated than T.B., should be simultaneously . . . deprived of a chance to reunify with his father, even if his older brother T.B. did not or could not." Once a juvenile court finds section 361.5, subdivision (b)(6), applies, however, "it may not offer family reunification services unless it finds, by clear and convincing evidence, that reunification is in the best interests of the minor. (§ 361.5, subd. (c).)" (*Pablo S. v. Superior Court* (2002) 98 Cal.App.4th 292, 301.) This is because when one of the section 361.5, subdivision (b), exceptions applies, the general rule favoring reunification is replaced by an assumption that offering services would be

an unwise use of governmental resources. (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 744.)

Thus, here, once the Agency proved Father's acts constituted severe physical harm as defined by section 361.5, subdivision (b)(6), it was Father's burden to show, by clear and convincing evidence, that granting reunification services was in the children's best interest. Father did not present any evidence, nor does he point to any evidence on appeal, to support his position that it would have been in M.Y.'s best interest for Father to be awarded reunification services. He does assert that he never hit M.Y., but T.B. reported that Father hits M.Y., and a housemate reported that she observed Father hit M.Y., causing him to cry out in pain. Father also states that M.Y. never saw Father hit T.B., but M.Y. reported that Father hit T.B. and also "whopped [T.B.] with a belt." Because there was no clear and convincing evidence—much less any evidence— presented to show it was in M.Y.'s best interest for Father to receive reunification services, the juvenile court did not err in bypassing services to Father as to M.Y.

### Equal Protection

Father contends the court violated his equal protection rights by granting services to Mother, but not to him. He asserts that because he and Mother were similarly situated as parents who had been convicted of felonies for abusing T.B., there was "no justification . . . why [M]other was to receive reunification services but [F]ather was not." Father forfeited the claim by failing to raise it below. In any event, the contention fails on the merits.

"There is no constitutional requirement of uniform treatment." (*Estate of Horman* (1971) 5 Cal.3d 62, 75.) Moreover, "[r]eunification services are a benefit; a parent is not constitutionally entitled to reunification services." (*In re Alanna A.* (2005) 135 Cal.App.4th 555, 563; see also *Renee J. v. Superior Court*, *supra*, 26 Cal.4th at p. 750 [a parent does not have a constitutionally protected liberty interest in the state's providing him with reunification services].) "To succeed on [a] claim under the equal protection clause, [a party] first must show that the state has adopted a classification that affects two

14

or more similarly situated groups in an unequal manner." (*People v. Wilkinson* (2004) 33 Cal.4th 821, 836.)

Here, Father and Mother were not similarly situated. Father had a significant criminal history that dated back to 1989 and included felony and misdemeanor convictions for vehicular theft, possession and sale of cocaine, possession of a firearm, furnishing and selling marijuana, reckless driving, battery of a former partner, and battery and false imprisonment of a cohabitant partner. He committed severe physical abuse of T.B. despite having received extensive services in Contra Costa County. He continued to deny he had physically abused the children and accused T.B. of lying about the physical abuse in order to "sabotage [their] relationship." He denied he ever hit M.Y. despite evidence to the contrary. In contrast, Mother admitted she physically abused T.B., showed remorse, served time in jail for her acts, and was working towards reunifying with her children by visiting them consistently, taking parenting classes, attending college, and working towards obtaining a stable living environment. There was no evidence she ever physically abused M.Y., and her primary focus was to reunify with the children. Both children were afraid of Father and T.B. stated a clear preference for living with Mother. Father has not shown he and Mother were similarly situated and entitled to the same treatment.

*In re Mary G.* (2007) 151 Cal.App.4th 184, 199, on which Father relies, is inapposite. There, a father who had voluntarily acknowledged paternity in Michigan was denied presumed father status even though he would have qualified as a presumed father had he signed an identical form in California. The Court of Appeal held the father was denied equal protection because "the disparate treatment . . . is based solely on geography, and location of a father inside or outside the state bears no more relation to the purposes of the presumed father statute than differing locations of fathers within California." (*Id.* at p. 200.) The father there was similarly situated to all fathers who signed the form in California except that he had signed the document outside the state. Here, as discussed above, Father was not similarly situated to Mother.

15

## DISPOSITION

The order is affirmed.

_____
McGuiness, P. J.

We concur:

_____
Pollak, J.

_____
Siggins, J.