Filed 6/18/13  Regina C. v. Superior Court CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIFTH APPELLATE DISTRICT

| | |
|---|---|
| REGINA C.,<br><br>       Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF STANISLAUS COUNTY,<br><br>       Respondent;<br><br>STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>       Real Party in Interest. | F066920<br><br>(Super. Ct. No. 516468)<br><br><br>**OPINION** |

## THE COURT[*]

ORIGINAL PROCEEDINGS; petition for extraordinary writ review.  Ann Q. Ameral, Judge.

Robert D. Chase, for Petitioner.

No appearance for Respondent.

John P. Doering, County Counsel, and Robin Gozzo, Deputy County Counsel, for Real Party in Interest.

-ooOoo-

---

[*]     Before Gomes, Acting P.J., Franson, J. and Peña, J.

Regina C. (mother) seeks an extraordinary writ (Cal. Rules of Court, rule 8.452) from a March 2013 juvenile court order setting a Welfare and Institutions Code section 366.26[1] hearing to select and implement a permanent plan for her seven-month-old son, Joshua. The court reached its decision having denied the parents services to reunify with Joshua, who suffered repeated physical abuse at the hands of his father. The court found mother, by her omission, also inflicted severe physical harm on Joshua and that it would not benefit the infant to pursue reunification services with mother. (§ 361.5, subd. (b)(6).) We agree with the juvenile court and deny this petition.

## FACTUAL AND PROCEDURAL HISTORY

*November 2 and 8, 2012[2] Visits to the Pediatrician*

On November 2, 12-week-old Joshua had a scheduled well-baby check with his pediatrician, Dr. Jonas Bernal. When Dr. Bernal entered the examination room, he was immediately struck by the appearance of Joshua's head. The frontal area of the infant's head was very prominent. In addition, Joshua's anterior fontanelle or soft spot was open and full. Joshua's head was obviously misshapen. These were new and unusual findings that concerned the doctor.

The circumference of Joshua's head that day measured 15.5 inches or 39.3 centimeters, which placed him in the "high normal" range for his chronological age. The circumference of Joshua's head, when last measured in late August, was 12.25 inches or 31.1 centimeters placing him at the 10th percentile for his age. This head circumference increase also concerned the pediatrician.

Dr. Bernal expected the parents would have been concerned by the shape of Joshua's head. The pediatrician asked the parents if they noticed Joshua's head size or

---

[1]    All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]    All further dates refer to 2012 unless otherwise indicated.

head shape and were they concerned. Mother reported she had noticed it but she attributed it to the head size in the father's family. The father said nothing.

The pediatrician asked the parents if they had any concerns and if Joshua had exhibited symptoms, such as irritability, increased sleepiness, projectile vomiting, changes in the baby's activity or any abnormal activities. The parents only mentioned Joshua spit up sometimes, but there was no vomiting. The parents had no other complaints or concerns to report. According to the parents, Joshua seemed to be doing well.

Dr. Bernal ordered a cranial ultrasound to check the infant's brain structures. He did not consider it an emergency at that time because Joshua did not have any symptoms, either reported by the parents or based on the doctor's physical examination, of increased intracranial pressure. Symptoms of increased intracranial pressure in an infant usually include projectile vomiting, a change in behavior, either the baby would be very irritable or very lethargic, and in extreme cases "sunsetting eyes" or eyes with a downward gaze.

The ultrasound, conducted on November 7, revealed a large collection of fluid in Joshua's brain. Once the pediatrician received the results of Joshua's ultrasound, he had the parents return on November 8. At that appointment, the parents stated Joshua had two vomiting episodes during the past two days. This caused the pediatrician increased concern. Also, the circumference of Joshua's head on November 8, measured at 16 inches or 40.6 centimeters. The one-half inch increase in less than a week's time was significant to the pediatrician.

Dr. Bernal arranged for the parents to immediately take Joshua to Children's Hospital in Madera.

*Joshua's Multiple Injuries*

On November 8, Joshua was admitted to the hospital for an urgent MRI, which uncovered there was bleeding in more than one area of his brain. Specifically, there were large, bilateral subdural hematomas in the cerebral hemispheres with evidence of prior

3

brain injury in the right parietal and frontal region. Due to the large fluid collection on Joshua's brain, he was taken to surgery to evaluate the subdural hematomas and to insert a drain. He was then admitted to the hospital's pediatric intensive care unit.

On November 10, a chest x-ray revealed Joshua had eight healing bilateral rib fractures. They appeared to be similar in age. These findings led to a medical consultation for possible nonaccidental trauma to the infant.

According to Dr. Philip Hyden, the hospital's child advocacy attending physician, each parent claimed no recall of any trauma which could have resulted in Joshua's brain and rib injuries. They did provide, however, additional information about the infant's history.

### Joshua's Prior Hospitalization

Joshua had been hospitalized between September 13 and 15 for what medical professionals termed an apparent life-altering episode or ALTE. The infant was alone with his father on September 13. The father purportedly fed Joshua and placed him in his crib. The father later checked on Joshua, who appeared to have difficulty breathing and was not moving his extremities. The father "'freaked out'" and called 911. When paramedics arrived, Joshua was bradypneic, lethargic and dusky.[3] He was held upright and burped, which resulted in a large amount of emesis or vomit. Joshua then became responsive and began crying. At a hospital emergency department, Joshua was much improved, yet he still had a moderate amount of non-forceful emesis. No apnea or hypoxia was noted. He was admitted to the hospital with an apnea monitor but had no apnea events.

### Joshua's Symptoms Prior to His November Hospitalization

Over a few days, before his November hospitalization, Joshua had episodes of projectile vomiting. The parents and maternal grandmother also noted Joshua's eyes

---

[3] Bradypneic comes from the noun "bradypnea," which means abnormally slow breathing.

4

were looking downward or "sunsetting." This was first observed on October 22, and occurred intermittently since then. According to his parents, Joshua did not seem to be in any pain and had been growing, despite the frequent vomiting.

Dr. Hyden informed detectives from Stanislaus County Sheriff's Department of Joshua's injuries. On November 14, detectives and social workers from Stanislaus County visited with the parents, as well as Dr. Hyden, at the hospital. The detectives and social workers met first with mother.

Mother described herself as a stay-at-home mom and primary caregiver for Joshua. Joshua was a good baby and did not fuss too much. She did not have an explanation for Joshua's injuries. She claimed she did not know how it was possible that Joshua was "injured."

When one detective advised mother that Joshua's injuries were consistent with shaken baby syndrome, mother had little reaction. She reported she had not shaken him. She added when they, an apparent reference to her and the father, got upset or frustrated, they would put Joshua down and walk away. She also reported there were concerns about Joshua's head being oddly shaped since September or October. During the interview, mother had a flat affect and did not show any emotion.

### Joshua's Injuries Resulted from Child Abuse

On November 15, Dr. Hyden reported to a social worker and a detective that Joshua's injuries were the result of child abuse. There was old and new blood on Joshua's brain and at the location of the old blood there was a hole in the brain from the injury. Joshua also had a retinal hemorrhage in his left eye and possible old hemorrhages that had healed. The bilateral rib fractures were old. In addition, he showed signs of "sunsetting" eyes for some time.

A social worker informed the parents on November 15 that Joshua would be taken into protective custody. Mother became upset and wanted to know how that could be. During her conversation with the social worker, mother "wanted to know who was on her

5

side and if she could get the police on her side." When the social worker explained the juvenile court process, mother again wanted to know who was on her side and stated that everyone was against them. During the conversation, mother did not talk about Joshua's well-being or safety. She only spoke of herself and how this was affecting her.

***The Father's Confession***

Later on, on November 15, the father asked to meet with Dr. Hyden and explain how Joshua was injured. The father stated he had considerable apprehension when caring for the infant, and would become frustrated when Joshua would cry or be fussy. He frequently shook the baby back and forth, very hard. The father knew that it would hurt the child.

The father specifically recalled the day in September when he was left alone with Joshua. He fed and burped the infant, but when Joshua would not stop crying, the father burped him "'really hard, then shook him.'" He later noticed the child was having difficulty breathing, and his legs were limp. The father then stated that he performed CPR on the baby, and called 911. He did not inform the paramedics or admit to the hospital emergency department what had transpired. He claimed no one asked him if he had injured the infant. As a result, the father felt that he may have not harmed Joshua.

After Joshua returned home from the hospital in September, and the father was alone with the child, he would continue to become frustrated when Joshua would cry, and shake him, with short, rapid but forceful, back-and-forth movement. The father recalled that Joshua's head would go forward and backward. The father began counting the days between shaking events, to see if he could prevent himself from doing recurrent harm to his son. He said that he was afraid to tell his wife because she was critical of him.

When the father confessed his actions to a Stanislaus County detective, the father said he had shaken Joshua "about seven to eight times." To Dr. Hyden, the father said he did so "ten or eleven times, maybe more." The father counted the days when the father had not hurt Joshua because he was shaking the infant so often.

6

In Dr. Hyden's opinion, the event which created the September ALTE was most likely the episode that caused Joshua's intracranial injuries and rib fractures.

***Mother's Response***

Mother later spoke privately with Dr. Hyden. Mother was calm and objective, stating that she was surprised that her husband could hurt Joshua, and wondered if she had been "'too hard'" on the father, not realizing that he was dealing with so much stress. She acknowledged that they had recently obtained a new home, had a new baby, and her husband was dealing with too many issues at once. Mother also recalled that she had observed the father "'jolting'" the infant by grabbing him forcibly on one occasion, but she intervened, and did not believe the father meant to cause Joshua harm.

During a November 16 conversation with one of the social workers, mother again mentioned seeing the father "'jolt'" Joshua. According to mother, this occurred one time when Joshua was very little. She claimed she did not think it was a big deal at the time because Joshua was swaddled and his head did not flop around. The father had been burping Joshua. She described the jolt as a "'tremor of [the father's] hand.'" She reported that afterwards she told the father they "'could not take it out on him'" when they were frustrated with Joshua because he was just a baby and did not know any better. Mother claimed she just recently remembered this event.

Mother also reported that Joshua's head began to become enlarged around September or October and they were not really concerned about it based on conversations with family and friends. She also noticed Joshua's head "'felt heavy'" but did not think anything of it. As for the infant's prominent forehead, mother thought he was going to have a big forehead because of the father's family. She also claimed for the first time that she had asked the pediatrician about Joshua's head at the infant's regular check-up. While others stated it was obvious Joshua's head was abnormally large and misshapen, mother reported she had worked with older children but did not have experience with babies and did not know any different. The agency later learned that mother had six

7

years of experience as a child care provider and more specifically worked in an infant class for approximately two years.

*Juvenile Dependency Proceedings*

While Joshua remained hospitalized, real party in interest Stanislaus County Community Services Agency (agency) petitioned the juvenile court to exercise its dependency jurisdiction over the infant. Based on the foregoing facts, the agency alleged Joshua came within the juvenile court's jurisdiction under section 300, subdivisions (a) [serious physical harm inflicted nonaccidentally by the child's parent], (b) [serious physical harm as a result of parental neglect], and (e) [severe physical abuse of a child under the age of five by a parent or anyone known by the parent who knew or reasonably should have known the person was physically abusing the child]. The agency later recommended the court also remove Joshua from parental custody and deny each parent reunification services. The agency argued the parents should be denied services because Joshua came within the court's jurisdiction under section 300, subdivision (e) due to the parent's conduct (§ 361.5, subd. (b)(5)) and because Joshua should be adjudged a dependent pursuant to any subdivision of section 300 as a result of the infliction of severe physical harm to him by a parent, and it would not benefit Joshua to pursue reunification services with the offending parent (§ 361.5, subd. (b)(6)).

<u>Contested Evidentiary Hearing</u>

Over several days in February and March 2013, the juvenile court held a contested jurisdictional/dispositional hearing. By this time, Joshua was out of the hospital and making progress. However, he had clearly suffered permanent brain damage and was exhibiting some developmental delays. In addition to the hole in his brain, Joshua was missing approximately 10 percent of his brain, which would never grow back.

At the beginning of the jurisdictional/dispositional hearing, the father waived his rights, pled no contest to the dependency petition's allegations, and waived his right to custody and reunification services.

8

Dr. Husam Abdulnour, a pediatrician who cared for Joshua during his September hospitalization, testified that Joshua's symptoms were most consistent with gastro-esophageal reflux. Upon Joshua's September hospital discharge, Dr. Abdulnour advised mother that if the baby continued vomiting he needed to be returned to the clinic.

Melissa Hale, a mental health clinician, testified about a clinical assessment she recently conducted of mother. Based on her assessment, Hale recommended mother be psychologically evaluated in order to explain her apparent lack of insight. It did not appear that mother accepted any responsibility for what happened to Joshua. According to Hale, during the assessment, mother claimed she became concerned a couple of days prior to Joshua's doctor appointment when he began vomiting.

When mother took the witness stand, she confirmed that at some point in late October she noticed Joshua did vomit. She also vividly remembered that on October 31, Joshua vomited and it was a "grave concern" to her. However, she did not take Joshua to the doctor that night. Mother claimed when she took Joshua for his November 2 check-up, she reported her concerns about Joshua's vomiting to Dr. Bernal. Mother did not have an explanation however for why, if she told Dr. Bernal on November 2 about Joshua's vomiting, she did not seek medical attention for Joshua sooner than just waiting for his next appointment.

Dr. Bernal testified there was no mention at the November 2 appointment of Joshua vomiting. Had he been informed that on October 31 Joshua had "vomiting of grave concern," Dr. Bernal would have most likely sent Joshua to the emergency room.

Mother admitted she had used the word "jolt" to describe the father's conduct on one occasion. His conduct and her conversation with him about dealing with frustration occurred sometime in September. However, "jolt" was not the proper word to describe what she actually saw.

She denied knowing anything about sunsetting eyes before her conversation with Dr. Hyden. At most, the maternal grandmother did mention to her at the end of October

9

that Joshua's eyes might look a little funny. Mother, however, did not take any action in response to the grandmother's observation. Mother did not think Joshua's eyes were abnormal during the two months prior to his removal.

Mother also denied believing Joshua's head looked either inappropriately large or misshapen during the two months prior to his removal. She denied telling the social worker in November that Joshua's head began to be large around September or October or that his head was large and misshapen. Mother did admit saying Joshua's head did feel heavy when she held him.

Mother admitted she did not take any responsibility for what happened to Joshua while he was in her care and custody. She also did not believe that there was anything she could have done differently. If he were returned to her care, she would look for honesty in people to ensure Joshua's safety.

Dr. Angela Rosas, an expert in child abuse, testified on mother's behalf. In the doctor's opinion, there was no significant enlargement of Joshua's head size until the week before his November admission to the hospital. However, Dr. Rosas could not completely rule out any pattern of abnormal head growth in September or October because there was no measurement of Joshua's head circumference in those months. Mother would not have recognized the child's head was misshapen. Also, in the doctor's view, Joshua's symptoms were slowly progressing. Before November 8, a caregiver would not be able to recognize symptoms "specifically of child abuse."

Photographs submitted by mother did show that starting in October, Joshua had a downward gaze. However, according to Dr. Rosas, there was nothing specific in the photographs that would make nonaccidental trauma obvious. On the other hand, photographs of Joshua starting on October 24 showed his head was misshapen, as well as the prominence of his forehead.

Dr. Rosas also testified about the age of Joshua's injuries. In her opinion, the rib fractures were two to four weeks old from when the November x-rays were taken. Some

of the brain injuries could have been months old, as in September or even earlier. The older brain injury was a hole in Joshua's brain. Dr. Rosas agreed with Dr. Hyden's opinion that the September ALTE event was the most likely episode to have caused the older brain injury and would explain the older rib fractures. The clinical symptoms that Joshua exhibited in September were consistent with abusive head trauma.

However, at least one brain injury occurred probably within a few days of November 8. That injury would have contributed to the increase in the volume of subdural fluid. Also, there was quite a bit of fluid, indicating an injury that was several weeks to a month old.

Joshua's maternal grandmother testified about Joshua's eyes not focusing. She noticed this on October 18, as she changed his diaper. However, she did not mention it to mother. The maternal grandmother, who acknowledged she was concerned, instead "looked into it" by searching baby ocular development on the internet. When she saw Joshua between October 18 and November 8, his eyes were not focusing approximately 60 percent of the time. The maternal grandmother mentioned Joshua's eyes looking downward to mother toward the end of October. The maternal grandmother did so because it had been a concern of hers and to see if mother agreed. They did not agree.

Court's Ruling

Following closing arguments, the court exercised its jurisdiction over Joshua under section 300, subdivisions (a), (b), and (e). It also adjudged Joshua a dependent child and removed him from parental custody.

The court could not find by clear and convincing evidence that mother abused Joshua or that she knew he was being abused. Therefore, it would not deny her reunification services under section 361.5, subdivision (b)(5). However, it did deny mother reunification services under section 361.5, subdivision (b)(6) based on the severe physical harm Joshua suffered.

11

The court did not find mother credible. As examples, the court noted it did not accept mother's testimony that: she never thought Joshua's head was misshapen; she told Dr. Bernal on November 2 that Joshua had been vomiting, or that she used the word "jolt" incorrectly to describe what the father did to Joshua when he was very young. Another credibility issue for the court arose based on mother's early statement that she had no experience with babies when later it turned out that she did.

The court found Joshua had observable signs for quite some time that something was wrong with him. The court did not believe mother could have missed knowing something was wrong with Joshua. Someone, namely mother, should have taken the baby to the doctor earlier to assure prompt medical attention. The court was "flabbergasted" that mother would not rush Joshua to the emergency room. In particular, it found Joshua's vomiting on October 31 gave mother her "grave concern," but she did nothing. She still did nothing after the November 2 appointment despite his ongoing vomiting.

## **DISCUSSION**

### I.     *The juvenile court did not deny mother her statutory right to counsel or due process.*

At a November 26 detention hearing for Joshua, the juvenile court did not appoint counsel for either of the parents. As a preliminary matter, mother contends the juvenile court consequently denied her statutory right to have counsel at the detention hearing (§ 317, subd. (d)) and her constitutional right to due process. We disagree.

A juvenile detention hearing is the first hearing conducted once a child has been taken into temporary custody and a petition is filed with the juvenile court to exercise its dependency jurisdiction. (§§ 309; 319.) The social worker must make a prima facie showing that the child comes within section 300 (the grounds for jurisdiction), as well as that continuance in the parent's home is contrary to the child's welfare. (§ 319, subd. (b).) Assuming there is a prima facie showing, the court issues a detention order and sets a jurisdictional hearing at which the social worker must show by a preponderance of the

12

evidence that the child comes within section 300. (§ 355, subd. (a).) Once the court exercises its jurisdiction, the social worker must show, by clear and convincing evidence, that there exists the requisite risk of harm to warrant the court removing a child from parental custody. (§ 361.)

At a detention hearing, the court shall appoint counsel for the parent "[w]hen it appears to the court that [the parent] is presently financially unable to afford and cannot for that reason employ counsel …." (§ 317, subd. (b).)

In this case, the juvenile court did not appoint counsel for either parent at the November detention hearing because neither appeared to qualify. The couple was married, the father had a fulltime job making in excess of $40,000 a year and they recently bought a house. Although both parents said they could not afford counsel, neither parent had even spoken to any attorneys and mother in particular did not know how much an attorney would cost. The court urged the parents to speak with attorneys and made clear the parents could come back and renew their requests once they spoke with some attorneys about fees and could show they could not afford those fees.

The court could have continued the detention hearing for one day. (§§ 319, subd. (c); 322.) However, the court did not abuse its discretion by not granting a one-day continuance. By this point, Joshua had been in protective custody for many days and still the parents had done nothing so far as seeking counsel was concerned. One day in all likelihood would not have made a difference.

Instead, the court briefly trailed the hearing for the parents to review the petition and the social worker's report. Mother then told the court she underlined "a few things that I didn't say or are not correct." Yet, when the court gave her the chance to cross-examine the social worker who wrote the report, mother did not pose any questions. The court then found a prima facie showing, and set the jurisdictional hearing.

A few days later, mother returned to juvenile court and persuaded another judge to appoint counsel for her. That judge reserved the ability-to-pay issue.

13

On this record, we conclude the evidence did not compel the juvenile court to appoint counsel for mother on November 26, nor did it violate mother's statutory right to have counsel at the detention hearing. In any event, mother makes no showing that any statutory error was prejudicial. She overlooks the low evidentiary standard of a prima facie showing at the detention hearing compared to the higher evidentiary standards the juvenile court must apply at the jurisdiction hearing and to warrant removal from parental custody. She also does not contest in this writ proceeding the sufficiency of the evidence to support the juvenile court's multiple jurisdictional findings or its removal order. Therefore, we conclude any statutory error related to the detention hearing was harmless.

We likewise reject mother's due process claim. Her constitutional argument is meritless in that it is little more than a conclusional statement that her due process rights were violated. (*People v. Wharton* (1991) 53 Cal.3d 522, 563 [bare mention of a due process claim on appeal does not merit a reviewing court's consideration].) In any event, she appears to assume her due process claim amounts to structural error and therefore she is entitled to reversal per se. However, she cites no authority to support such an assumption. She also overlooks the state supreme court's decision in *In re James F.* (2008) 42 Cal.4th 901, 917 in which the court questioned whether the structural error doctrine, established for certain errors in criminal proceedings, has any place in the quite different context of juvenile dependency proceedings. The court also observed the question of prejudice is relevant in a dependency proceeding when the child's welfare is at issue. (*Ibid.*) Given mother's failure to demonstrate any resulting prejudice from the juvenile court's initial decision not to appoint her counsel and to proceed with the detention hearing, we conclude mother is not entitled to any relief.

II.    ***There was substantial evidence that mother, by her omission, inflicted severe physical harm on Joshua.***

Mother also challenges the order denying her reunification services under section 361.5, subdivision (b)(6). Claiming there was insufficient evidence that she knew the

14

father was abusing their child, mother contends the court erred by denying her services under section 361.5, subdivision (b)(6). We disagree.

As a general rule, reunification services are offered to parents whose children are removed from their custody, in an effort to eliminate the conditions leading to loss of custody and to facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 163.) But recognizing that it may be fruitless to provide reunification services, the Legislature has enacted provisions for "fast-track" permanency planning under certain circumstances. (*In re Baby Boy H*. (1998) 63 Cal.App.4th 470, 478.) We review the juvenile court's order denying reunification services under section 361.5, subdivision (b) for substantial evidence. (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.)

The governing provision in this case, section 361.5, subdivision (b)(6), provides in relevant part:

> "Reunification services need not be provided to a parent ... when the court finds, by clear and convincing evidence, any of the following: [¶] ... [¶] (6) That the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of ... the infliction of severe physical harm to the child ... by a parent ..., and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent ...."

A finding of the infliction of severe physical harm for purposes of section 361.5, subdivision (b)(6) "may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body or the body of a sibling or half sibling of the child by an act or *omission* of the parent ...." (§ 361.5, subd. (b)(6); italics added.) Section 361.5, subdivision (b)(6) "is not limited to the parent or parents whose act directly caused the child's injury." (*Tyrone W. v. Superior* Court (2007) 151 Cal.App.4th 839, 851.) For example, where parents were aware of their child's pain and disfigurement resulting from an accidentally broken leg, their failure to seek medical attention for two months was

15

deemed infliction of severe physical injury by omission. (*Pablo S. v. Superior Court* (2002) 98 Cal.App.4th 292, 301.)

By arguing there was insufficient proof that she knew Joshua was suffering severe physical abuse, mother ignores the juvenile court's findings. As mentioned above, the juvenile court acknowledged it could not find clear and convincing evidence that mother did know the father was severely abusing Joshua. If it had, it would have denied mother reunification services on the alternative ground of section 361.5, subdivision (b)(5). Section 361.5, subdivision (b)(5) essentially prohibits services when a child under the age of five has suffered severe physical abuse by a parent or by any person known by the parent, if the parent knew or reasonably should know the person was physically abusing the child (§ 300, subd. (e)).

On the other hand, the court did find that: Joshua had observable signs for quite some time that something was physically wrong with him and mother could not have missed them; and mother should have taken the baby to the doctor earlier to assure prompt medical attention. It was on this basis, distinct from whether mother knew Joshua was suffering abuse, that the court denied her services under section 361.5, subdivision (b)(6).[4]

Over the space of approximately six weeks, mother observed Joshua's head had become misshapen and enlarged, his gaze had changed and he frequently vomited, including projectile vomiting to the point that she claimed it was of "grave concern." Yet, as Joshua's primary caregiver, mother failed to seek medical care for him. This was despite the fact that she had been specifically told in September by the hospital pediatrician that she should bring Joshua in if he continued vomiting.

---

[4]     The court also found in this regard it would not benefit Joshua to pursue reunification services with mother, a finding that she does not challenge in this writ proceeding.

There was also evidence that Joshua's injuries occurred over a period well beyond the September ALTE episode. The rib fractures were two to four weeks old from when the November x-rays were taken. One brain injury was several weeks to a month old as of the November 8 hospital MRI. There was also at least one brain injury, which occurred probably within a few days of that MRI. In other words, had mother alerted doctors to Joshua's vomiting or downcast gaze before November 8, she could have prevented at least one or more of his serious injuries. For example, we know from Dr. Bernal's testimony that had he been alerted to either Joshua's recurrent downward gaze or his vomiting on October 31 that was of grave concern to mother, the pediatrician would have arranged for an earlier ultrasound or most likely sent Joshua to the emergency room on November 2.

Even if mother did not know the father was abusing Joshua, we conclude there was substantial evidence to support a finding that mother's conduct amounted to "infliction of severe physical harm" by "omission" for purposes of section 361.5, subdivision (b)(6).

## DISPOSITION

The petition for extraordinary writ is denied. This opinion is final forthwith as to this court.

17