[No. B155364. Second Dist., Div. Three. Apr. 9, 2002.]

PABLO S., SR., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Real Party in Interest.

**COUNSEL**

Nancy Rabin Brucker for Petitioner Pablo S.

L. Ernestine Fields for Petitioner Gilma S.

No appearance for Respondent.

Law Offices of Anne E. Fragasso, Cameryn Schmidt and Lori Glazer for Minors.

Lloyd W. Pellman, County Counsel, and Gary P. Gross, Deputy County Counsel, for Real Party in Interest.

---

**OPINION**

**KLEIN, P. J.**—G. S. (mother) and Pablo S. (father) (collectively parents) seek writ review (Welf. & Inst. Code, § 366.26, subd. (b)(1 );[1] Cal. Rules of Court, rule 39.1B) of the juvenile court's order denying family reunification services under section 361.5, subdivision (b)(6), and setting a hearing under section 366.26 as to minors Pablo S. and Maya S. We deny the writ petition.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Detention of the minor.*

On June 28, 2001, six-year-old Pablo fell while playing with a scooter and broke his left femur. For almost two months, Pablo's parents failed to seek medical treatment for the injury. During this period, Pablo could not walk and reported crawling with his arms to pull himself along the floor. The leg healed in a rotated position, shorter than the other leg, and would not support the child's weight. Ana B., who lived in the apartment above Pablo's, reported hearing Pablo cry and scream "on and off every other day for about two months." On the morning of August 24, 2001, while parents were at work, Ana B. offered Pablo's maternal grandmother, who resided with parents, the services of her daughter, Michelle T., to take Pablo to the hospital. Maternal grandmother and Michelle T. took Pablo to Presbyterian Community Hospital.

A children's social worker (CSW) arrived at the hospital at 4:45 p.m. Michelle T. told the CSW that Pablo hopped to her car with a cane, held onto her and said, "Please don't leave me." Michelle said Pablo's leg was "crooked, shorter, and swollen on his thigh area. The area was bigger than his other leg. [Pablo] said that they had taken him to church and someone had pulled on his leg . . . ." Michelle spent the entire day with Pablo at the hospital and cried when she spoke to the CSW.

A nurse told the CSW that Pablo's X-rays revealed a "mid-shaft now well healed femur fracture." The leg could not presently bear the child's weight

---

[1]Subsequent unspecified statutory references are to the Welfare and Institutions Code.

because it had healed in a rotated position. Pablo told the nurse his parents had been using ice, heat and herbal remedies but that Pablo had not seen a doctor because his parents were too busy working. The nurse told the CSW, "I can't believe the child never complained of pain. The bone was fractured straight through. . . . When [the femur] breaks the leg becomes unstable and it is like walking on spaghetti. So there would be a lot of pain." The nurse telephoned mother at 2:30 p.m. Mother indicated she would come to the hospital if she could get a ride.

Dr. Robert Jack, the emergency room physician, told the CSW that Pablo said he was scared to return home because mother had threatened to hit Pablo with a stick.

Maternal grandmother told the CSW that father carried Pablo inside after the scooter accident and put Pablo on the couch. Pablo could not extend his leg because of the pain. Maternal grandmother indicated father iced the leg for about 20 days and maternal grandmother rubbed a potato on the area. Maternal grandmother indicated the leg had been "very swollen." Pablo was not taken to a doctor because father and mother said it was just a pulled muscle and told Pablo it was all in his head. Maternal grandmother told the CSW she relied on mother and father to take Pablo to the doctor. She told them every week to take Pablo to the doctor but they said they were waiting for papers. Maternal grandmother indicated Pablo complained of pain for about 20 days and hopped around. Maternal grandmother could see Pablo's "leg was deforming."

Pablo told the CSW the injury hurt like someone had hit him in the head with a rock. Pablo said he cried every day after the injury and that mother and father used profanity to encourage him to walk and called him "dummy" and "stupid" because he could not walk. Pablo stated father "got tough and threw [him] on the bed like a pillow." When Pablo reported this incident to mother, mother said she did not care and, on another occasion, mother threatened to hit Pablo with a stick on the back of his injured leg if he would not walk. Pablo indicated he was afraid to be returned home. Pablo stated mother "hit me with one of my video controls on my left leg and she . . . would pick me up by my hands and make me walk and then she would let go and I would drop to the floor and she kicked me on my left leg with her foot. She was wearing sandals. She kicked me 10 or 11 times. I cried. I would move around like [this] (he demonstrated dragging himself). I would hop on my left leg. She wanted to hit me with a stick."

Pablo indicated he wished to reside with his aunt in Texas and maternal grandmother because his aunt does not hit him. Pablo said he wanted father to stop hitting him, drinking beer and smoking cigarettes.

The CSW went to the parents' apartment at 6:15 p.m. and knocked loudly several times but no one answered. The CSW went to the apartment above the parents' apartment and spoke to Michelle T.'s mother, Ana B., who reported father had returned from school at 2:00 p.m. Ana B. advised father that Pablo was at Presbyterian Hospital with a broken femur. Father apparently misunderstood this statement and replied, "First his leg and now his finger?" Father then went to work.

The CSW returned to the parents' apartment and again knocked loudly on the door without any response. The CSW returned to the hospital and was advised mother had telephoned from the apartment. The CSW called mother and asked why mother had not answered the door. Mother indicated she had not heard the CSW knocking. Mother stated father told her at 2:30 p.m. that Pablo had been taken to the hospital. Mother telephoned the hospital but was advised to wait for the nurse to call with X-ray results. Mother was trying to arrange a ride and did not know how to get to the hospital by bus.

The CSW returned to mother's apartment and spoke to mother, who said Pablo's injury did not "look like something major" to her. The leg was swollen and Pablo reported pain but mother put ice packs on the injury and gave the child Tylenol. Approximately two weeks after the injury, mother called the doctor assigned to her through her insurance carrier but the doctor was on vacation so mother did not make an appointment. Mother did not take Pablo to an emergency room because the copayment, $50, was too high. When the CSW asked about free clinics, mother stated she called one but was told the X-ray technician had gone for the day. Mother intended to call again but first needed to obtain Pablo's birth certificate. Mother denied Pablo had complained of pain and indicated he never cries. Mother thought Pablo wanted attention because he was jealous of his six-month-old sibling, Maya. Mother indicated maternal grandmother took Pablo's food to his bed and Pablo "pees in the bed." Mother stated Pablo "moves his foot around so we assumed he [was] okay." When the CSW inquired whether mother had noticed the deformity of Pablo's leg, she indicated she had not because the leg was always covered. Mother indicated she was planning to take Pablo to the doctor soon and indicated maternal grandmother had taken Pablo to some ladies for a massage two or three weeks earlier.

At 11:30 p.m., the CSW went to Orthopaedic Hospital where Pablo had been transferred and spoke with Dr. Zamorano who told the CSW the injury was a "high energy fracture" and would have "hurt all the time." Zamorano indicated Pablo would be able to walk on the leg in about another month and that it would be another year before "major surgery" to realign the leg could be performed. Zamorano indicated early medical treatment would have

avoided the need for surgery. Zamorano told the CSW that massaging the leg or making the child walk on it was cruel but probably did not worsen the injury.

Mother and father arrived at Orthopaedic Hospital at 2:30 a.m. on August 25, 2001. Father told the CSW he treated the injury with ice and a cream he obtained in Mexico but stopped the ice treatment when Pablo got ice burn after three or four days. Father indicated Pablo complained of pain "all the time." Father stated he had never seen a broken bone and thought such an injury could be observed. Father initially denied calling Pablo "dummy" because he could not walk but then admitted he may have done so on one or two occasions when he became frustrated. Father admitted he had struck Pablo on the arm because he did not get up to go to the bathroom. Father indicated that after Pablo had a few accidents, he told Pablo to ask when he had to go to the bathroom. Father denied he had ever lifted Pablo by the hair and said the injury was "just a scooter accident and . . . I thought it would pass. I thought if it was broken, there would be unbearable pain. He only cried when we asked him to walk. I thought he was just scared. I thought it was getting better. It was just ignorance, not bad intentions on my part." Father indicated the swelling went down after two weeks and Pablo did not complain of pain again. Father conceded Pablo hops on one leg and reports pain when he tries to walk but thought Pablo was pretending in order to get attention. Father expressed remorse and told the CSW that maternal grand-mother's friends from church had massaged Pablo and reported "it was all in his mind and he wants attention." They recommended Pablo not be assisted. Father admitted a history of cocaine abuse but claimed sobriety of four or five months.

The CSW noted there was no indication parents had been abusive to Pablo before the injury or that they were abusing Maya. The Los Angeles County Department of Children and Family Services (DCFS) detained Pablo but allowed Maya to remain with parents who indicated they would move from the apartment to permit the children to live with maternal grandmother if DCFS requested. However, Maya was detained on August 29, 2001, and placed in foster care due to concern she was at substantial risk of harm.

Results of father's live scan revealed arrests in 1990 and 1999 for possession of a controlled substance with successful completion of a 24-month deferred entry of judgment program as to the latter offense.

2. *Postdetention proceedings.*

Pablo's placement social worker indicated Pablo did not show emotion during the first visit with parents after his detention and, during that visit,

father was very possessive of Pablo, rubbing his back and stroking his hair. After half an hour, Pablo was ready to return to his cottage. Mother moved away during the visit and did not have contact with Pablo, and maternal grandmother was very emotional at the end of the visit. Pablo reportedly was doing well at his placement. Pablo has been enrolled in counseling since October 17, 2001, and receives physical therapy twice a week at Orthopaedic Hospital.

The foster family agency therapist indicated Pablo's counseling would focus on increasing his social and emotional competence and to involve Pablo in interactive play situations to overcome his tendency to isolate himself. Pablo also needed assistance coping with "self-apportioned blame." "Pablo appears to be very attached to his family members and placement with his sister Maya with whom he has been visiting on a weekly basis would seem to be to his benefit."

On October 23, 2001, Maya's foster mother gave a seven-day notice to have Maya removed from her care due to ongoing conflicts with mother. Foster mother reported mother complained about Maya's clothing, was inappropriate during visits and had undressed Maya during visits to check the child's body.

While Pablo continued to require medical placement, he and Maya could not be placed together. However, DCFS indicated the minors would benefit from placement together and that an appropriate placement for them was being sought. Parents and both minors visited twice weekly.

Parents submitted the dependency petition on the basis of the DCFS reports in the file.[2] The juvenile court sustained the petition and set the matter for disposition.

DCFS sought denial of family reunification services under section 361.5, subdivision (b)(6).[3] The CSW concluded it was "unfathomable" why Pablo was not taken for medical attention in light of mother's health insurance for

---

[2]As sustained, the dependency petition alleged father threw Pablo onto a bed when the child's leg was broken, forced Pablo to walk on his broken leg and called Pablo derogatory names despite the child's complaints of severe pain. Mother hit Pablo with a video control on his broken leg, lifted him by the hands and tried to make him walk, then released him causing him to drop to the ground. Mother also kicked Pablo on his left leg. Each parent failed to protect Pablo. Pablo is fearful of mother and father and does not want to return to their home. Parents' failure to obtain medical care caused Pablo to require major surgery to straighten his leg. Such acts by mother and father place sibling Maya at risk of similar abuse.

[3]Section 361.5 subdivision (b), lists the relatively extreme or unusual circumstances in which reunification services need not be provided. These circumstances include death of a sibling from abuse or neglect, severe sexual abuse, repeated physical or sexual abuse, parental

herself and Pablo. The CSW asserted denial of services was appropriate because mother and father "severely neglected Pablo, they forced him to walk with his fracture, they called him derogatory names and they physically abused him, Pablo was verbally, emotionally and physically abused by his parents. Pablo will have to undergo major surgery to repair his . . . leg. He faces surgery, recovery, physical therapy, and . . . it is unknown if the length of his leg will improve."

Parents' counselor, Joel Barnett, marriage and family therapist trainee, indicated parents had "participated enthusiastically" and "displayed an open and active approach to counseling" in the 11 weekly sessions they attended at Catholic Charities. "They have shown significant progress in their respective issues. That progress has not only been evident within the confines of our therapeutic sessions, but it has also become apparent in their daily life. Both [parents] have demonstrated insight regarding their respective issues as well as a genuine desire to improve them[selves]." Barnett recommended four additional months of therapy and indicated that, at the conclusion of the therapy, parents "will have reached if not exceeded our mutually agreed upon goals."

After hearing argument from the parties, the trial court ruled "this case does fit well within [section] 361.5, [subdivision] (b)(6). And the omission was not only the failure to take the child to a doctor or to the hospital. The omission was [the failure] to provide this child with an ounce of empathy, compassion or love." The juvenile court found it "amazing that three adults would be willing to witness a child being brutalized so badly for such a long period of time. [¶] This is far more cruel, far more cruel than a momentary lapse of judgment or a momentary loss of control that results in a parent breaking a child's bone. It is more understandable to me that a parent would lose control for a moment and do something regrettable that causes a child physical damage. [¶] This was conscious, a conscious decision to wake up every morning and go to sleep every night knowing that your flesh and blood is in pain, is in need, and a conscious decision to ignore that pain and that need. And I think this is far more cruel and far more severe than had [the injury] been [intentionally inflicted out of anger] . . . . [¶] You can't teach compassion, and you can't teach empathy. And . . . frankly, counseling . . . could not possibly teach something that is so lacking in both parents. [¶] . . . The . . . conscious, deliberate acts of cruelty to this child over a long

conviction of a violent felony, and willful abduction of the child from placement by the parent. Under section 361.5, subdivision (b)(6), as discussed more fully *ante*, family reunification services may be denied a parent who has inflicted severe physical harm on a child and the juvenile court finds it would not benefit the child to pursue reunification services with the offending parent.

period of time more than justifies a finding that it would be in the minors' best interest not to offer reunification."

CONTENTIONS

Parents contend the juvenile court erroneously denied family reunification services and the failure to order family reunification services impermissibly infringed their fundamental liberty interest to parent their children.[4]

DISCUSSION

1. *The record supports the juvenile court's denial of family reunification services.*

 Parents claim that because they did not "deliberately" or "consciously" inflict harm on Pablo, their conduct does not constitute severe physical abuse within the meaning of section 361.5, subdivision (b)(6). Parents assert far greater abuse was inflicted by the parents in *Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750 [50 Cal.Rptr.2d 858] and *Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159 [64 Cal.Rptr.2d 33]. Parents argue they treated Pablo with folk remedies, fed him appropriately, and attributed his behavior to jealousy of Maya. Parents note Maya received appropriate care at all times, DCFS initially planned to allow Maya to remain with parents and both parents immediately began to participate in counseling and parenting class, voluntarily tested for drugs and visited Pablo regularly. Parents assert they were not aware Pablo had a broken leg, failed to realize the seriousness of Pablo's injury and did all they could for the child within the scope of their knowledge. Parents assert they are capable of rehabilitation and the risk of reoccurrence of anything like what happened to Pablo is slight. Parents conclude that in light of the circumstances presented, family reunification services should have been provided.

We disagree. Section 361.5, subdivision (b)(6), provides, in pertinent part: "(b) Reunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence . . . . [¶] . . . [¶] (6) That the child has been adjudicated a dependent pursuant to any subdivision of Section 300 as a result of severe sexual abuse or the infliction of severe physical harm . . . by a parent . . . as defined in this subdivision, and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent . . . . [¶] . . . [¶] A finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, deliberate and serious injury inflicted

---

[4]Counsel for the minors has joined in DCFS's answer to parents' writ petition.

to or on a child's body . . . by an act or omission of the parent . . . ; deliberate and torturous confinement of the child . . . in a closed space; or any other torturous act or omission that would be reasonably understood to cause serious emotional damage."

Once a juvenile court finds section 361.5, subdivision (b)(6), applies, it may not offer family reunification services unless it finds, by clear and convincing evidence, that reunification is in the best interests of the minor. (§ 361.5, subd. (c).)

Section 361.5, subdivision (h), lists factors the juvenile court may consider in "determining whether reunification services will benefit the child pursuant to paragraph (6) . . . of subdivision (b) . . . ." These include: "(1) The specific act or omission comprising the . . . severe physical harm inflicted on the child or the child's sibling . . . . [¶] (2) The circumstances under which the abuse or harm was inflicted on the child or the child's sibling . . . . [¶] (3) The severity of the emotional trauma suffered by the child or the child's sibling . . . . [¶] (4) Any history of abuse of other children by the offending parent . . . . [¶] (5) The likelihood that the child may be safely returned to the care of the offending parent . . . within 12 months with no continuing supervision. [¶] (6) Whether or not the child desires to be reunified with the offending parent . . . ."

In light of Pablo's constant pain and the disfigurement that resulted from the broken leg, the parents' failure to provide medical attention constituted the infliction of serious injury by omission. None of the excuses offered by the parents explain their failure to act. Further, mother's admission she made inquiries regarding medical care for Pablo reveals she knew he needed treatment. Michelle T., the neighbor who transported Pablo to the hospital, immediately recognized the deformity of Pablo's leg and stayed with Pablo at the hospital all day until his parents arrived at the hospital at 2:30 a.m. Thus, for either parent to suggest they did not know Pablo needed medical help is simply not credible. Their neglect caused Pablo to suffer unreasonably and unnecessarily for two months and continues to harm Pablo who, in all probability, will have to undergo major corrective surgery. Instead of taking Pablo to see a doctor, father and mother physically and emotionally abused the child, forcing him to walk and throwing him around "like . . . a pillow."

Although it is unnecessary to our conclusion, parents' confinement of Pablo in the apartment for two months, and their treatment of Pablo during the confinement, likely also constitutes torturous conduct "that would be reasonably understood to cause serious emotional damage." (§ 361.5, subd.

(b)(6).) Thus, parents qualify for denial of family reunification services under two separate provisions of section 361.5, subdivision (b).

Maya also properly was removed from parents' care. "[A]n abusive parent's risk of recidivism is not necessarily limited to a child who was the parent's previous victim." (*Deborah S. v. Superior Court, supra,* 43 Cal.App.4th at p. 751.)

 Regarding the factors the juvenile court should consider listed in section 361.5, subdivision (h), quoted above, the only factor which favors parents is their lack of any prior history of abuse. However, based on the facts of this case, set out in detail above, each of the other factors must be resolved in favor of denying reunification services. The fact more serious abuse was inflicted in *Deborah S.* and *Raymond C.* does not excuse parents' conduct in this case. The record shows such callous disregard for Pablo's welfare that family reunification services appropriately were denied under section 361.5, subdivision (b)(6).

### 2. *No violation of parents' constitutional rights appears.*

Parents claim the failure to order family reunification services impermissibly infringed their fundamental liberty interest in parenting their children. Parents assert that when the juvenile court determines section 361.5, subdivision (b)(6) applies, it must make a further finding under section 361.5, subdivision (c), that the parents' behavior is unlikely to be changed by the provision of services. In making this determination, the juvenile court may consider the testimony of a competent professional. Here, parents argue, the juvenile court did not consider whether their behavior was likely to be changed and instead, looked only at their neglect of Pablo. In fact, parents assert there was evidence in the form of the letter from their therapist which indicated not only that they could change, but that they had changed and would need only four additional months of therapy to reach the case goals.

Parents assert the juvenile court ignored this evidence as well as Pablo's attachment to his parents and the fact Pablo blamed himself for the separation of the family. Parents note they lacked any previous history of neglect or abuse, their therapist believed they were making progress, parents treated Pablo with home remedies and did not know his leg was broken, and Pablo was happy in the emergency room. Parents note they were never afforded an opportunity to avail themselves of reunification services, as were the mother in *Deborah S.* and the father in *Raymond C.,* both of whom had a history of violent behavior. Parents argue Maya had been well cared for, both parents immediately enrolled in parenting and counseling and visited regularly. Parents assert the juvenile court's finding "you can't teach empathy" was not

based on any professional opinion that services would not be successful. Further, to deny family reunification services when there is substantial evidence that services would have been successful in reuniting this family, renders section 361.5, subdivision (b)(6) unconstitutional and violative of parents fundamental right to parent their children.

■ The entire thrust of parents' foregoing contention is based on the faulty premise that the second and third paragraphs of section 361.5, subdivision (c) apply to this case. They do not. These provisions apply only where family reunification services are denied under section 361.5, subdivision (b)(5), with respect to a minor under the age of five years. There is no requirement under section 361.5, subdivision (b)(6), that the social report discuss the likelihood that reunification services, if offered, would be successful. This requirement arises only when family reunification services are denied under section 361.5, subdivision (b)(5). Similarly, the asserted failure of the juvenile court to consider opinion testimony as to whether family reunification services were likely to prevent reabuse or continued neglect of the child applies only where family reunification services are denied under 361.5, subd. (b)(5). In any event, the letter from parents' counselor is of little assistance to their cause. Putting aside the fact the counselor is a trainee, the letter does not indicate the counselor knew what abuse Pablo endured, what issues parents needed to address or what mutually agreed upon goals had been set for parents. Finally, *In re Rebekah R.* (1994) 27 Cal.App.4th 1638 [33 Cal.Rptr.2d 265], relied upon by parents, also involved section 361.5, subdivision (b)(5), not subdivision (b)(6).

In sum, the application of section 361.5, subdivision (b)(6), to the facts of this case does not result in the denial of parents' constitutional rights. (See *Daria D. v. Superior Court* (1998) 61 Cal.App.4th 606, 610-613 [71 Cal.Rptr.2d 668].)

DISPOSITION

The writ petitions are denied.

Kitching, J., and Aldrich, J., concurred.