Filed 7/5/22; Certified for Publication 7/21/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| J.J., | C095308 |
| Petitioner, | (Super. Ct. No. STKJDDP20200000460) |
| v. | |
| THE SUPERIOR COURT OF SAN JOAQUIN COUNTY, | |
| Respondent; | |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Petitioner J.J. (mother) petitions for extraordinary relief pursuant to California

Rules of Court, rule 8.452.  Mother seeks review of an order denying family reunification

1

services and setting a permanency planning hearing under Welfare and Institutions Code section 366.26 (statutory section citations that follow are to the Welfare and Institutions Code). She argues that the juvenile court improperly bypassed reunification services. She further contends that real party in interest the San Joaquin County Human Services Agency (the Agency) has failed to comply with the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq. (ICWA)). The Agency disputes both contentions. Because the order denying reunification services was not supported by sufficient evidence, we grant the petition as to mother's first contention. Because the ICWA issue is premature, we reject mother's second contention.

## FACTS AND HISTORY OF THE PROCEEDINGS

This writ petition originates from a petition filed on December 16, 2020, under section 300. The petition alleged that the minors, J.K., E.C., and A.C., came within the provision of section 300, subdivision (a), serious physical harm; section 300, subdivision (b), failure to protect; section 300, subdivision (e), severe physical abuse; and section 300, subdivision (g), no provision for support; and section 300, subdivision (j), abuse of sibling.

On December 14, 2020, the Agency received a report from Stockton Police Department concerning A.C., who was found to have a parietal skull fracture, subdural hematomas on the left and right side of the brain, an overlying subgaleal hematoma, a one and a half-inch long laceration above the right eyebrow, left frontal contusion, and "scattered" bruises on the temple area. A.C. also had bruising around the nose, inner right ear and outer left ear, as well as "terrible" cradle cap. J.C. (father) denied causing the minor's injuries, first reporting that A.C. fell off of the couch and later claiming that the toddler, E.C., had accidentally dropped him on the floor. Father reportedly waited at least 30 minutes after A.C. was injured and bleeding from above his eye to call 911 for immediate emergency assistance.

2

Mother was not home when A.C. was injured. Mother reported having no suspicions that father caused the minor's injuries and believed the injuries occurred when E.C. picked up and accidentally dropped A.C. on the floor. The minor's attending physician, Dr. Jim Crawford, stated that he highly suspected child abuse because A.C. has sustained "significant trauma injury to the head and all of the injuries were from impact injury." Dr. Crawford reported that father's story that the minor was dropped on the floor was inconsistent with the injuries sustained by the minor because there "[were] too many point[s] of impact" and stated that the parietal bone, which was not easy to fracture, was fractured. The social worker performed a body check of the siblings, J.K. and E.C. but found no visible or suspicious marks on their bodies.

The social worker inquired about any possible Native American ancestry. Mother advised the social worker that she had Choctaw Indian heritage through her deceased maternal grandmother, who was a registered member of the tribe. Father stated that he had Cherokee, Blackfoot, and Oklahoma River Indian heritage. F.K., father of J.K., claimed no Native American ancestry. The Agency subsequently reported that notice under the ICWA would be sent to all federally recognized tribes and the Bureau of Indian Affairs (BIA) based upon the information it had obtained.

At the April 8, 2021, contested jurisdictional hearing, mother and father submitted on the amended jurisdictional report, and the juvenile court found that there was a factual basis for the allegations and the allegations were true. The juvenile court ordered supervised visits between mother, father, and the minors.

Following an interview with mother, the social worker reported in the disposition report that mother said she initially believed E.C. was responsible for A.C.'s injuries because the minor would "pull things off of the couches." Mother also stated that she questioned father, who told her the "truth" and "she was very upset about the lie that he told." Mother stated that father's medication "badly" affected him. The social worker reminded mother that she was observed questioning father at the police station about

3

"blacking out from alcohol use, not his medication." Mother clarified that she believed father was blacking out as a result of his medication because he drank only part of a bottle of alcohol found at the time the minor was injured and poured the rest out. Mother acknowledged that she was aware father was "blacking out or not fully coherent" when she left the three young minors alone in his care. Mother stated that father had "blacked out" on multiple occasions prior to A.C.'s injuries, but she denied any belief that father would intentionally hurt A.C. Mother also acknowledged that she should not have purchased the alcohol for father that night because she was aware that alcohol does not mix well with father's medication. Mother further stated that father sent her a picture of A.C.'s injuries after they occurred, and she contacted the paternal uncle to check on the situation, instead of contacting emergency medical assistance. Mother then stated that she could not believe father "could have purposely harmed this child," and she speculated that father may have dropped A.C. and fell on top of the infant. She explained, "He has never harmed the kids and I have never been afraid that he would hurt the kids in any way." Mother stated that father would run into things or fall during "black-outs" but did not demonstrate behavior changes. Mother conceded that father had a problem with alcohol and needed to be in a program to address his alcoholism. She claimed that she did not have any concerns about father's parenting while he was under the influence of alcohol.

The social worker also spoke with father, who claimed that he delayed in calling 911 because he was not thinking clearly and was afraid. Father claimed that his brother eventually called 911 but he was the one who spoke to the operator. Father stated that when mother became aware of the injuries, she directed him to call 911 but he did not. Father stated that he was not blacked out and remembered everything that occurred when A.C. was injured. However, father stated that he did not believe the injuries occurred as implied by Dr. Crawford, because the injuries would have been worse than they were. Father provided a new explanation for the minor's injuries, claiming that he was

4

beginning to feel drowsy from his medication and lost his footing when he stood up while holding A.C. Father explained that to prevent himself from falling, he dropped the minor, and the minor's head hit the crib before he hit the floor. The report showed that the nurse practitioner who cared for the minor at the hospital, Kelsey Merl, compared father's new explanation with the police photographs of the injury and the room. Ms. Merl stated that the explanation was inconsistent with the force necessary to cause the significant injuries. Ms. Merl explained that Dr. Crawford noted at least seven to eight separate one-centimeter bruises across the minor's face along with the multiple points of contact: parietal skull fracture, nose, upper lip, forehead, both eyes but primarily the right, and the ears. Ms. Merl stated that the injuries to the eyes were also concerning because they were more consistent with blunt force trauma. Ms. Merl stated that the minor's injuries were not from a simple fall as described by father due to the numerous injuries and points of impact on the minor. Ms. Merl stated that the injuries were consistent with the types of injuries intentionally inflicted and consistent with nonaccidental trauma.

The social worker recommended not providing reunification services to mother under section 361.5, subdivision (b)(6), because of the severe physical harm inflicted on A.C. and her failure to protect the minor, seek emergency medical assistance, and her refusal to listen to the medical professionals to understand the minor's injuries did not match the explanation provided by father. The social worker also recommended bypassing services for father under section 361.5, subdivision (a).

The Agency's August 11, 2021, supplemental disposition recommended not providing reunification services to mother under section 361.5, subdivisions (b)(5), (b)(6), and (b)(7). The report stated that section 361.5, subdivision (b)(5) applied because the juvenile court took jurisdiction under section 300, subdivision (e). The report stated that section 361.5, subdivision (b)(6) applied because A.C. was found to be a dependent as a result of the infliction of severe physical harm. The report stated that

5

section 361.5, subdivision (b)(7) should be applied as to siblings J.K. and E.C., if the juvenile court found bypass applicable as to A.C.

The contested dispositional hearing was held on September 30, 2021, October 18, 2021, November 3, 2021, and November 22, 2021. Mother testified that she believed the minors were detained because A.C. was injured by an "accidental drop," which resulted in a laceration above his eye and a parietal bone fracture. Mother testified that on the night of A.C.'s injuries, she called father after receiving the picture he sent of the minor with a cut on his browbone and then called the paternal uncle because she was three hours away. Mother testified that she spent time on the phone with father asking him about A.C.'s behavior, whether he was crying, and whether the bleeding had stopped because she was trying to assess the severity of the injury. Mother explained she did not call for any medical assistance because she told father to call an ambulance and she "was told that was being done." Mother testified that she subsequently spoke with Dr. Crawford about the minor's injuries, and Dr. Crawford told her the minor was "moving and hit a stationary object or the minor was stationary and another object moving had hit him." Mother testified that she was aware the minor received the injuries but did not believe father intentionally harmed the minor. Mother testified that father told her what to tell the police had occurred to explain the minor's injuries.

Mother testified that she provided father with a bottle of alcohol, despite knowing he had an alcohol problem, and that was a mistake. Mother testified that this was the first time one of the minors was hurt by father. Mother testified that she previously saw father blackout a "handful of times." Mother testified that father took medication to help him sleep and at times would also drink prior to taking his medication. She testified that she left the home after a disagreement with father the night the minor was injured. Mother testified that father made statements regarding suicide the night the minor was injured.

The social worker testified that she recommended not offering services to mother and father under section 361.5, subdivisions (b)(5), (b)(6), and possibly (b)(7). The

6

social worker's testimony showed that, during her investigation, she spoke with Dr. Crawford about A.C.'s injuries and noted that, based on the evidence, father caused the injuries. The social worker testified that it was concerning that despite mother's knowledge of the minor's injuries, she continued to state that it was not possible the minor was injured by father. The social worker also testified she was concerned that mother had knowledge of the minor's injuries for about an hour but did not call for medical assistance herself. Finally, when asked if there was any evidence that father had physically disciplined any of the children, the social worker testified that J.K. disclosed in the Child Advocacy Center interview that father had struck both him and the minor E.C. with a belt. There was no further testimony about whether mother was aware of that or whether father caused any injuries to J.K. or E.C.

At the conclusion of testimony and argument by counsel, the juvenile court took the matter under submission. At the November 22, 2021 contested dispositional hearing, the court stated that it reviewed the disposition and supplemental disposition reports, notes from testimony, and the appropriate code sections. The court reiterated that multiple injuries were sustained by A.C. and noted that Dr. Crawford and Ms. Merl both determined the injuries were nonaccidental and would not have occurred based on the various explanations provided by father. The court concluded it was undisputed that father caused the minor's injuries. The court noted father's history of alcoholism, his unstable mental health condition, and his intense emotional conversations that evening. The court noted that there was prior physical discipline of J.K. and E.C. with a belt in the home. The court stated that the law did not require that mother be present when the abuse occurred and stated it was her conduct that led this case coming under the jurisdiction of the court because she knew or should have known of the danger of leaving the minors in the home with father given the state of his mental health and alcohol use. The court found that mother was aware of father's prior physical discipline of the older two minors with a belt. The court stated that, despite the use of alcohol being an ongoing

7

issue, mother purchased alcohol for father, who was drinking prior to her leaving the home, and she did not take steps to protect the minors.

The juvenile court further found that when mother was made further aware of A.C.'s injuries once she received phone calls and pictures from father, she did not return home immediately and did not call for emergency medical assistance. The court stated that for all of those reasons, it found that there was clear and convincing evidence that mother and father were both perpetrators of the injuries to the minor. The court found that mother and father could not be protective because they continued to express disbelief and refused to follow the logic as to how the injuries occurred. The court noted that mother remained steadfast in her belief of father's statements and chose to continue the relationship with father. The court then found that the treatment goals were not met and the minors could not safely return to mother and father. The court stated that while father was the actual perpetrator, mother helped set the events in motion by purchasing the alcohol for father and not interceding on behalf of the minors. Accordingly, the court ordered that reunification services not be provided to mother and father under section 361.5, subdivisions (b)(5), (b)(6), and (b)(7). The court set a hearing under section 366.26 and advised the parents of their right to appeal. The court did not make any ICWA findings.

Mother timely filed a notice of intent to file a writ petition.

DISCUSSION

I

*Bypass for Reunification Services*

By this petition, mother seeks review of the juvenile court's order bypassing family reunification services and setting a permanency planning hearing. Pursuant to California Rules of Court, rule 8.452, this court issued an order to show cause why the relief prayed for in mother's petition should not be granted, requesting a response to the

8

petition by the Agency.  We received further briefing from the parties.  As we shall explain, we agree with mother that family reunification services were improperly denied to her because the order was based on insufficient evidence.

When a child is removed from a parent's custody, the parent generally must be provided with family reunification services.  (§ 361.5, subd. (a); *In re Lana S.* (2012) 207 Cal.App.4th 94, 106.)  There are "narrowly specified exceptions" to this rule, however (*id.* at p. 106), as set out in section 361.5, subdivision (b).  The application of these exceptions in the juvenile court is subject to a clear and convincing standard of proof.  (*In re Lana S.*, at p. 106.)  We review a denial of reunification services for substantial evidence.  (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.)

"[S]ection 361.5, subdivision (b)(6) requires the juvenile court to find that a parent inflicted severe physical harm on the child by act, omission or consent before it may deny reunification services to that parent under subdivision (b)(6).  The Legislature did not intend subdivision (b)(6) to apply to deny reunification services to a negligent parent; rather, the parent must have been complicit in the deliberate abuse of the child." (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 843; see also *In re Kenneth M.* (2004) 123 Cal.App.4th 16, 21 ["By its express terms, subdivision (b)(6) applies to the parent who inflicted severe physical harm to the minor"].)  "A finding of the infliction of severe physical harm, for the purposes of this subdivision, may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body . . . by an act or omission of the parent or guardian, or of another individual or animal with the consent of the parent or guardian; deliberate and torturous confinement of the child . . . in a closed space; or any other torturous act or omission that would be reasonably understood to cause serious emotional damage." (§ 361.5, subd. (b)(6)(C).)

In its factual findings, the juvenile court concluded that A.C. suffered severe physical harm because the minor sustained severe injuries, mother gave alcohol to father and left the minors in his care despite her knowledge of his alcoholism, and mother failed

to timely seek medical attention for A.C. when she discovered the injuries. We review whether there is substantial evidence supporting the court's implicit findings that mother inflicted serious injuries on A.C. through her acts, consented to father's acts, or omissions.

First, there is no question, as the juvenile court properly concluded, that father was the direct perpetrator of the abuse. As to whether mother consented to the abuse, the Agency suggests this case is akin to *Amber K. v. Superior Court* (2006) 146 Cal.App.4th 553, wherein reunification services were denied to mother under section 361.5, subdivision (b)(6), even though it was clearly the father who was the actual perpetrator of the sexual abuse at issue. (*Amber K.*, at pp. 561-563.) But in *Amber K.*, there was testimony from a child victim that he had told the mother about the sexual abuse over the course of 18 separate incidents; the record thus supported a finding that the mother was an offending parent alongside the father for actively consenting to the abuse. (*Id.* at pp. 560-562.) "By its express terms, section 361.5, subdivision (b)(6) applies to a parent who gave actual or implied consent to the sexual abuse of the child by another person, as well as to the parent who was the actual perpetrator of the sexual abuse." (*Id.* at p. 561.)

The Agency points to mother's prior knowledge of father's alcohol abuse, his blacking out, and purported prior knowledge of father physically disciplining the two siblings with a belt as substantial evidence for the conclusion that mother gave actual or implied consent to A.C.'s head injuries. The juvenile court focused on mother's acts of buying father a bottle alcohol when she knew he was having mental health issues and leaving the minors in his care. There is no doubt mother's acts were extremely negligent, but they are not necessarily tantamount to consent to abuse without further evidence showing mother had knowledge that father was abusing A.C. or at least likely to abuse A.C. While the juvenile court found that mother was aware of father's prior physical discipline of the two siblings with a belt, that finding is not supported by the evidence on this record. The social worker testified that J.K. disclosed in the Child Advocacy Center

10

interview that father had struck both him and the minor E.C. with a belt. In his interview, J.K. claimed that father spanked him with a belt and spanked E.C. with his hand when they got in trouble. When asked if mother knew about father physically disciplining him and E.C., which he referred to as "whoopings," J.K. said, "no." The interviewer asked him why mother did not know about it and he responded, "[b]ecause she does." The interviewer was not able to gain any further clarity on whether mother knew father was physically disciplining two of the minors. It was the minors' counsel who asserted to the court during argument that J.K. claimed mother knew about the discipline with a belt, but that misstates J.K.'s report. Further, there are no details in the record concerning the severity or frequency of these "whoopings" and whether they occurred when father was drinking alcohol. The social worker performed a body check of the siblings, J.K. and E.C., after A.C.'s injuries but found no visible or suspicious marks on their bodies. There is thus insufficient evidence supporting a finding that mother consented to A.C.'s abuse.

Finally, with respect to section 361.5, subdivision (b)(6), we must consider whether mother's omissions inflicted serious physical injury on A.C. The juvenile court found that mother did not call medical services for A.C. herself. Mother explained she did not call for any medical assistance because she told father to call an ambulance and she "was told that that was being done." This is consistent with father's report that when mother became aware of the injuries, she directed him to call 911 but he did not. It is also unclear if the delay in and of itself constitutes an omission inflicting serious physical harm on A.C. because there was no evidence presented that A.C.'s injuries were made worse by the delay in seeking medical attention. *Pablo S. v. Superior Court* (2002) 98 Cal.App.4th 292 is instructive on this issue. There, the minor accidentally broke his leg, but his parents failed to seek medical attention for nearly two months. (*Id.* at p. 294.) The court rejected the parents' claim that the application of section 361.5, subdivision (b)(6), was inappropriate because "they did not 'deliberately' or 'consciously' inflict harm on" the minor. (*Pablo S. v. Superior Court*, *supra*, 98 Cal.App.4th at p. 300.) "In

11

light of [the minor's] constant pain and the disfigurement that resulted from the broken leg, the parents' failure to provide medical attention constituted the infliction of serious injury by omission." (*Id.* at p. 301.) In other words, the injury to a minor for purposes of the dependency case was caused by the parents' failure to seek medical attention.

In theory, the same rationale could apply to the instant case. Even if mother had nothing to do with A.C.'s injuries, one might posit that the delay of 30 minutes to an hour in getting medical care for A.C. inflicted serious physical harm in its own right. These facts and reasoning amply support the court's jurisdictional and custodial findings as against mother. But there remains a gap between the court's factual findings and the conclusion that mother should be denied reunification services under section 361.5, subdivision (b)(6)—namely, the need for evidence demonstrating that mother's omission inflicted severe physical harm on A.C. This gap is not bridged in the record. The record shows mother was three hours away when she received the picture father sent showing A.C. had a cut on his browbone; she called the paternal uncle who was closer to go assist father. Mother testified that she spent time on the phone with father asking him about A.C.'s behavior, whether he was crying, and whether the bleeding had stopped because she was trying to assess the severity of the injury. Mother directed father to call an ambulance and was told that was being done. Based on this evidence, it is not clear that the delay was an omission by mother in addition to father. While father did delay, it is also speculative whether A.C.'s medical outcome worsened due to the delay. In sum, substantial evidence does not support the court's order under section 361.5, subdivision (b)(6).

The juvenile court also found section 361.5, subdivision (b)(5) applicable to mother. Reunification services need not be provided to a parent when the court finds, by clear and convincing evidence "[t]hat the child was brought within the jurisdiction of the court under subdivision (e) of Section 300 because of the conduct of that parent." (§ 361.5, subd. (b)(5).) Section 300, subdivision (e) provides: "The child is under five

12

years of age and has suffered severe physical abuse by a parent, or by any person known by the parent, if the parent knew or reasonably should have known that the person was physically abusing the child." The subdivision defines severe physical abuse as "any single act of abuse that causes physical trauma of sufficient severity that, if left untreated, would cause permanent physical disfigurement, permanent physical disability, or death; . . . or more than one act of physical abuse, each of which causes bleeding, deep bruising, significant external or internal swelling, bone fracture, or unconsciousness; or the willful, prolonged failure to provide adequate food." (§ 300, subd. (e).)

"Section 300, subdivision (e), and subdivision (b)(5) of section 361.5, . . . do not require identification of the perpetrator. [Citation.] Read together, those provisions permit denial of reunification services to either parent on a showing that a parent or someone known by a parent physically abused a minor. [Citation.] Thus, 'conduct' as it is used in section 361.5, subdivision (b)(5) refers to the parent in the household who knew or should have known of the abuse, whether or not that parent was the actual abuser." (*In re Kenneth M.*, *supra*, 123 Cal.App.4th at p. 21.) But it is certainly possible that a section 361.5, subdivision (b)(5), denial of reunification services could apply to only one parent. "It may well be that the minor's other parent was in no way involved, either as the abuser or as one with the requisite knowledge of abuse by another. There is no reason in this type of situation to deny the other, or innocent, parent reunification services." (*In re Joshua H.* (1993) 13 Cal.App.4th 1718, 1732.)

As we have discussed, there is insufficient evidence for a finding that mother directly inflicted A.C.'s injuries; there is also no question these injuries constitute the severe physical abuse of A.C. under section 361.5, subdivision (b)(5). The issue, therefore, is whether there is substantial evidence supporting the juvenile court's implicit finding that mother knew or should have known of the physical abuse of A.C. (See *L.Z. v. Superior Court* (2010) 188 Cal.App.4th 1285, 1292 (*L.Z.*).) It is not required that the Agency prove mother was aware of the severity of the abuse of A.C., only that

13

mother was aware that father was in fact physically abusing him. (See *In re Joshua H., supra*, 13 Cal.App.4th at pp. 1729-1732.) Here, the Agency again predominately relies on the mother's knowledge of father's alcohol abuse and episodes of "blacking out." Without a prior known history of father's abuse, this is insufficient. As we have discussed, the record is at best ambiguous about whether mother knew that father had spanked J.K. with a belt, but J.K. denied it in his interview. It is also unclear that even if mother had prior knowledge of the spankings of the two siblings, that would be enough to impute that mother knew or should have known of abuse of A.C. There was no evidence in the record of any prior allegations of abuse involving A.C. In fact, mother emphatically is in denial that father was capable of abusing A.C.

In *L.Z., supra*, 188 Cal.App.4th 1285, "Z.Z. was two months old and suffered unexplained, nonaccidental injuries while in her parents' care that included a spiral fracture to her left humerus and nine broken ribs." (*Id.* at p. 1287.) There, the juvenile court sustained a dependency petition under section 300, subdivisions (b) and (e). (*L.Z.,* at pp. 1287-1288.) The mother and father were teenage parents who had issues with domestic violence and alcohol abuse. (*Id.* at p. 1288.) "Although Mother noticed that Z.Z. seemed to be in pain for about a week, her injuries were not discovered until Mother brought her in to a regularly scheduled doctor's visit," at which time the mother expressed concern about the baby's arm and X-rays were taken. (*Ibid.*) The *L.Z.* appellate court reversed the juvenile court's denial of reunification services to mother. (*Id.* at pp. 1293-1294.) The conditions in which Z.Z. was raised "created circumstances that exposed Z.Z. to situations of extreme danger. This . . . could support a jurisdictional finding under section 300, subdivision (e) that may be based upon the conduct of either parent." (*L.Z.*, at p. 1293.) But there was insufficient evidence indicating the mother should have been able to know Z.Z. was being abused based on her physical condition. (*Id.* at pp. 1292-1293.)

14

Similarly, here, mother's testimony is indicative of an attempt to minimize father's conduct and her own role in enabling his alcoholism.  But the missing link in the juvenile court's analysis is to suggest that her knowledge of his alcohol abuse somehow demonstrates by clear and convincing evidence that mother was aware father had abused or would abuse A.C.  In sum, the record does not include substantial evidence to support a finding that mother knew or should have known of parental abuse by father.

We emphasize that we do not intend to suggest that mother's behavior has been acceptable.  Both the jurisdictional order and the dispositional order, to the extent it required removal, were well supported.  The issue addressed in this writ petition is a discrete one.  It is simply whether sufficient evidence was presented to bypass reunification services for mother as to A.C.  Since the evidence was not sufficient, the dispositional order requires correction in this regard.  Additionally, section 361.5, subdivision (b)(7) applies to the siblings of a child who was abused.  Because we agree with mother that subdivisions (b)(5) and (b)(6) do not apply to allow bypassing her reunification services as to A.C., then subdivision (b)(7) does not allow bypassing her reunification services as to J.K. and E.C.  The petition is thus granted as to all three of the minors.

II

*ICWA Compliance*

Mother contends that the Agency failed to comply with the inquiry and notice requirements of the ICWA despite a reason to believe the minors were Indian children.  As we shall explain, the ICWA issue is premature, and we therefore reject this contention.

"The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency

15

proceedings. (See 25 U.S.C. § 1902; *In re Levi U.* (2000) 78 Cal.App.4th 191, 195-196.) A major purpose of the ICWA is to protect 'Indian children who are members of or are eligible for membership in an Indian tribe.' (25 U.S.C. § 1901(3).)" (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.) The ICWA defines an " 'Indian child' " as a child who "is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4).) The juvenile court and the county welfare department have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (Cal. Rules of Court, rule 5.481(a); § 224.2, subd. (a).)

Here, because the juvenile court made no final ICWA ruling at or before the challenged dispositional hearing as to whether the ICWA applied to the proceedings, mother's claim is premature. That is, ICWA issues are not ripe for review. " 'Ripeness' refers to the requirements of a current controversy." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 59.) An issue is not ripe for review unless and until it is "sufficiently concrete to allow judicial resolution even in the absence of a precise factual context." (*Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 170; see *id.* at pp. 170-172.) Because the dependency case is still ongoing, any perceived deficiencies with ICWA inquiry and noticing may still be resolved during the normal course of the ongoing dependency proceedings. Therefore, we decline mother's invitation to assess the adequacy of the ICWA inquiry and noticing process that is, based on our assessment of the record, still ongoing as well. (*In re M.R.* (2017) 7 Cal.App.5th 886, 904 [ICWA claim was premature where no final ICWA ruling made at dispositional hearing].)

16

DISPOSITION

The petition for extraordinary relief is granted and an extraordinary writ hereby issued. The juvenile court's November 22, 2021, dispositional orders are ordered vacated only to the extent they denied mother family reunification services and set a section 366.26 hearing. The matter is remanded with directions to the juvenile court to set a hearing and modify its dispositional orders, providing mother with appropriate reunification services. The temporary stay previously issued by this court is dissolved. This opinion shall become final immediately upon filing. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

_____

HULL, Acting P.J.

We concur:

_____

DUARTE, J.

_____

RENNER, J.

17

Filed 7/21/22

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----


| | |
|---|---|
| J.J.,<br><br>       Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN JOAQUIN COUNTY,<br><br>       Respondent;<br><br>SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY et al.,<br><br>       Real Parties in Interest. | C095308<br><br>(Super. Ct. No. STKJDDP20200000460)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |


APPEAL from a judgment of the Superior Court of San Joaquin County, Anthony P. Lucaccini, J. Petition granted by opinion.

1

Miriam T. Lyell, Public Defender, Rose M. Cardoso and Nelson C. Lu, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Shann S. Kennedy, Deputy County Counsel for Real Parties in Interest.

THE COURT:

The opinion in the above-entitled matter filed July 5, 2022, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

BY THE COURT:

_____
HULL, Acting P.J.

_____
DUARTE, J.

_____
RENNER, J.

2