Filed 5/16/25  In re J.J. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M.M.,<br><br>Defendant and Appellant. | E084840<br><br>(Super.Ct.No.J299168)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel, and Joseph R. Barrell, Deputy County Counsel, for Plaintiff and Respondent.

1

# I. INTRODUCTION

In 2023, nine-year-old J.J. went to a neighbor's home and asked to be adopted. She reported being physically abused at home and presented with multiple, visible injuries on her toes, feet, and knees that were scabbing and healing. As a result, plaintiff and respondent San Bernardino County Children and Family Services (CFS) filed a petition pursuant to Welfare and Institutions Code[1] section 300 et seq. on J.J.'s behalf. At the jurisdictional and dispositional hearing, the juvenile court removed J.J. from defendant and appellant M.M. (Father)'s custody and denied Father reunification services pursuant to a "bypass" provision set forth in section 361.5, subdivision (b)(6), which provides that a juvenile court "shall not order reunification for a parent" if the child has been adjudicated a dependent as the result of the infliction of severe physical harm and the juvenile court determines that it would not benefit the child to pursue reunification services. (§ 361.5, subds. (b)(6)(A), (c)(2).)

Father appeals, arguing that the juvenile court's application of the bypass provision in section 361.5, subdivision (b)(6), is not supported by substantial evidence. Specifically, Father argues (1) that Father's negligence in failing to prevent abuse perpetrated by his partner is not substantial evidence that can support the application of section 361.5, subdivision (b)(6); and (2) substantial evidence did not support the juvenile court's conclusion that it would not benefit J.J. to pursue reunification services. We

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

conclude that substantial evidence in the record supports the juvenile court's factual findings and affirm the dispositional order.

## II.  BACKGROUND

A.  *Facts and Petition*

Father and A.S. (Mother) are the biological parents of J.J.  J.J. spent the first few years of her life living with Mother and stepfather,[2] but left the home after Mother and stepfather divorced.  Sometime in 2020, J.J. began living with Father and Father's partner, C.B.  In November 2023, J.J. reported to a neighbor that she was being physically abused in the home and presented with multiple injuries to her feet, legs, and knees.  As a result, CFS filed a petition pursuant to section 300 on behalf of J.J., alleging that Father engaged in the physical abuse of J.J., Father failed to protect J.J. from physical abuse, and that J.J. was subject to acts of cruelty while in Father's home.

B.  *Jurisdictional and Dispositional Hearing*

On October 17, 2024, the juvenile court held a contested jurisdictional and dispositional hearing.  The juvenile court admitted into evidence a detention report, jurisdiction and disposition report, addendum report, two additional information reports, and the stipulated testimony of multiple witnesses.

---

[2]  The record suggests that Mother's husband at the time J.J. was born agreed to be placed on J.J.'s birth certificate, knowing that he was not her actual biological father.  In 2017, there was a court order amending J.J.'s birth certificate to remove his name as a parent.

1. Detention Report

According to the detention report, CFS received an immediate response referral in November 2023 after J.J. reported to a neighbor that she was being physically abused at home. J.J. reported that: both Father and C.B. would physically strike her with a wire, belt, and paddle; C.B. would pour boiling water on her; and C.B. would force her to crawl until her feet bled. J.J. was observed to have multiple injuries on her feet, legs, and knees that appeared to be in the process of healing and scabbing over. Father and C.B. denied all of J.J.'s allegations when interviewed by a social worker, and Father claimed that any injuries were likely because J.J. wore shoes that were too tight. However, J.J. was examined by a forensic medical examiner at the children's assessment center who concluded that the observable injuries on J.J.'s body were consistent with J.J.'s reports of being physically abused and tortured. As a result, CFS obtained a detention warrant and J.J. was detained from Father.

2. Jurisdiction and Disposition Report

According to the jurisdiction and disposition report, a social worker conducted a follow up interview with J.J. J.J. repeated her allegations that she was physically hit with a wire, belt, and paddle while in the home. J.J. also described that she incurred burn wounds because C.B. would force her to sit inside of a " '15-20-gallon clear storage container' " and pour boiling water on her. Finally, J.J. described that C.B., as a form of discipline, would force her to perform physical exercise and crawl for long periods of time until J.J. was in pain. The most recent incident of abuse occurred only the weekend prior to the intervention by a social worker. In this interview, J.J. clarified that Father

4

was not the one who physically struck her or poured boiling water on her, but she stated that Father would participate in forcing her to perform physical exercise as a form of discipline. J.J. also disclosed that Father was aware of at least some of her injuries but instructed J.J. to tell others that the injuries were from wearing shoes that were too tight.

In a follow up interview with a social worker, Father denied all allegations that J.J. was physically abused in his home by any person. He acknowledged forcing J.J. to perform physical exercise as a form of discipline. Father also acknowledged that on the initial date of the response referral, a social worker advised him to take J.J. to the hospital to have J.J.'s injuries examined; Father insisted that he followed the social worker's instructions, despite taking J.J. to a different medical facility than the one suggested by the social worker. Father also insisted that when he took J.J. to be examined, the doctor could not determine whether J.J.'s injuries were burn injuries or were from wearing shoes that were too tight; Father stated that if J.J. had suffered any burn injuries, it must have been self-inflicted.

CFS attached six photographs taken on the date of the initial response referral depicting scabbing injuries on both of J.J.'s feet, both of her legs, and both of her knees. CFS also attached the discharge paperwork from the hospital where Father took J.J. to be examined, which showed that the doctor who examined J.J. diagnosed J.J. with a burn injury and provided discharge instructions related to caring for a burn injury.

3. Addendum Report

The addendum report summarized a social worker's interview with C.B. C.B. disclosed that she had been in a romantic relationship with Father since 2020; she began

5

living together with Father and J.J. sometime in 2022; and she and Father had maintained their relationship despite J.J.'s allegations. C.B. asserted that J.J. was lying about all her allegations against C.B.

The addendum report also summarized a social worker's interview with the forensic medical examiner who initially examined J.J. at the children's assessment center. The examiner observed " 'patterned hair loss' " on J.J. consistent with someone repeatedly pulling out hair; scars on both feet consistent with burn injuries or J.J.'s reports of being forced to crawl until wounds formed; and symmetrical wounds on both of J.J.'s feet which would be inconsistent with accidental self-infliction. According to the examiner, J.J. also disclosed that she suffered an injury to her thumb from being physically attacked by C.B.; experienced pain in her ankle from an incident in which Father " 'body slam[ed]' " her; and had never received medical attention for any of her injuries prior to the date social workers intervened and instructed Father to seek medical care for her. The examiner opined that J.J.'s dental hygiene appeared to be " 'very poor' "; J.J. appeared to be " 'malnourished' "; and J.J. exhibited food insecurity behaviors. Finally, the examiner disclosed that a follow up examination revealed no new injuries and that all of J.J.'s previously noted injuries had been healing, which suggested that none of the injuries were self-inflicted.

In a follow-up interview with a social worker, Father admitted that he had never taken J.J. to a doctor or dentist for any type of care but maintained that no care was necessary because the school nurse never informed him that J.J. was in need of any care. Father confirmed that he made no attempt to inquire about J.J.'s wellbeing after she was

6

detained. He continued to insist that on the day that CFS intervened, J.J. had no visible injuries except a single mark; and he found it difficult to believe that J.J. did not want contact with him.

4. Additional Information Reports

In an additional information report filed June 2024, CFS reported that there had been no in-person visitation between Father and J.J., as J.J. had consistently refused to participate in any such visits and expressed her desire to have no contact with Father. CFS also reported that Father has continued to deny that J.J. suffered any abuse; has maintained his relationship with C.B.; and has not taken any initiative to reach out to CFS to inquire about J.J.'s wellbeing. Additionally, Father failed to make himself available to participate or agree to an individualized education plan for J.J., resulting in the juvenile court ordering that J.J.'s current caregivers be given educational rights. However, Father did complete a 12-week parenting education program, as well as individual therapy.

In an additional information report filed October 2024, CFS reported that Father had only engaged in sporadic and brief telephone visits with J.J., as J.J. had refused any attempts to participate in in-person visits and often refused to speak with Father over the phone for any extended period of time. Additionally, J.J. expressed to a social worker that she had no desire to ever reunify with Father or see him in-person.

5. Stipulated Testimony

It was stipulated that if called to testify, C.B.'s children would testify that they never saw J.J. abused by anyone while inside the home and never observed their mother pour boiling or hot water on J.J. J.J. would testify that she never informed Father that

7

C.B. had inflicted any injuries on her for fear of retribution by C.B. A detective with the San Bernardino Police Department would testify that he made initial contact with J.J. after she first reported abuse and that J.J. had noticeable injuries on both of her knees, as well as blisters on both of her feet.

Finally, it was stipulated that Father would testify that he never witnessed C.B. use corporal punishment or withhold food from J.J. but only witnessed C.B. requiring J.J. to stand in a corner or taking away electronics as forms of discipline. Father would admit that he had used corporal punishment on J.J. on one occasion more than a year prior, but it did not result in any injury or marks. Father would maintain that at the time social workers intervened, C.B. had only a single blister on one toe. He would express his desire to reunify with J.J. and his commitment to living separately from C.B., if J.J. were returned to his custody. There was no stipulated testimony on behalf of C.B.

6. Findings and Disposition

The juvenile court sustained the jurisdictional allegations against Father, formally removed J.J. from Father's custody, and denied Father reunification services pursuant to the bypass provisions of section 361.5, subdivision (b)(6). In reaching this conclusion, the juvenile court concluded that the evidence showed that there had been "excessive disciplinary exercise as reported as to both parents, as well as independently"; but also that Father "should have objectively seen things that weren't right" and "should have investigated." The juvenile court also concluded that reunification services would not be in J.J.'s best interest, citing the fact that injuries appeared to have been inflicted repeatedly over a long period of time; J.J. appeared to suffer from severe emotional

trauma; and that it was unlikely that Father could successfully reunify within the statutory timeframe, even if he were to receive services. Father appeals from the dispositional order.

## III. DISCUSSION

### A. *General Legal Principles and Standard of Review*

"After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child." (*In re M.D.* (2023) 93 Cal.App.5th 836, 856.) " '[T]he general rule is that when a dependent child is removed from the parent's . . . physical custody, child welfare services, including family reunification services, must be offered.' " (*In re A.R.* (2021) 11 Cal.5th 234, 245; *In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.) However, reunification " 'need not be provided' " to a parent if the juvenile court finds true by clear and convincing evidence any of the statutorily enumerated circumstances set forth in section 361.5, subdivision (b) (*In re A.E.*, at p. 1141; § 361.5, subd. (b)), which are sometimes referred to as " 'bypass' " provisions (*Tyrone W. v. Superior Court* (2007) 151 Cal.App.4th 839, 845-846). One of the enumerated circumstances for bypassing reunification services is where "the child has been adjudicated a dependent . . . as a result of . . . the infliction of severe physical harm to the child . . . by a parent . . . , and the court makes a factual finding that it would not benefit the child to pursue reunification services with the offending parent." (§ 361.5, subd. (b)(6)(A).)

The department bears the burden of proving whether a bypass provision applies. (*In re T.R.* (2023) 87 Cal.App.5th 1140, 1148; *In re Jayden M.* (2023) 93 Cal.App.5th

9

1261, 1272-1273 (*Jayden M.*); *In re S.B.* (2013) 222 Cal.App.4th 612, 623.) "We review a juvenile court's determination that the Department has carried its initial burden . . . for substantial evidence." (*In re Jayden M.*, at p. 1273.)

The sole claim raised by Father in this appeal is that the juvenile court erred in applying the bypass provision of section 361.5, subdivision (b)(6), to deny him reunification services. Specially, Father argues that the findings required to support the application of the bypass provision were not supported by substantial evidence.[3] For the reasons set forth below, we disagree.

B. *The Juvenile Court's Finding that Father Inflicted Severe Physical Injury Is Supported by Substantial Evidence*

Father's primary argument with respect to the application of section 361.5, subdivision (b)(6), is focused on the contention that the statute does not apply to a parent who is only negligent in preventing others from inflicting injury on a child. We do not disagree with this general proposition. While "[a] finding of the infliction of severe physical harm . . . may be based on, but is not limited to, deliberate and serious injury inflicted to or on a child's body . . . by an act *or omission* of the parent" (§ 361.5, subd.

---

[3] We recognize that even where a bypass provision applies, a parent may request the juvenile court grant reunification services by showing that services would be in the dependent child's best interest. (§ 361.5, subd. (c)(2).) Under this provision, the parent bears the burden to show reunification services would be in the child's best interest by clear and convincing evidence, and the juvenile court's determination is reviewed for abuse of discretion. (*In re Jayden M.*, *supra*, 93 Cal.App.5th at pp. 1272-1273.) However, Father argues only that the best interest findings necessary to apply section 361.5, subdivision (b)(6), in the first instance are not supported by substantial evidence, and we limit our discussion to the arguments actually asserted by Father on appeal.

(b)(6)(C) [emphasis added]), California authorities have interpreted the omission language in a limited manner, holding that the statute was not intended to apply to omissions that amount to mere negligence (*Tyrone W. v. Superior Court*, *supra*, 151 Cal.App.4th at p. 851; *In re J.J. v. Superior Court* (2022) 81 Cal.App.5th 447, 456).

However, as CFS correctly notes on appeal, Father's argument overlooks the fact that the juvenile court expressly found that section 361.5, subdivision (b)(6), applied both because Father was a direct perpetrator of physical abuse and because he failed to protect J.J. from physical abuse that he should have discovered. "Since only one valid ground is necessary to uphold the juvenile court's bypass decision" (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121; *In re Madison S.* (2017) 15 Cal.App.5th 308, 324), the finding that Father directly participated in physical abuse of J.J. can itself be sufficient to support the application of the bypass provision set forth in section 361.5, subdivision (b)(6), even if Father's failure to protect J.J. from C.B.'s alleged acts of abuse can be considered only negligence.

With respect to the finding that Father was a direct perpetrator of physical abuse, we conclude that substantial evidence in the record supports this finding. J.J. initially reported to a neighbor and social worker that *both* Father and C.B. physically struck her with a wire, belt, and paddle. J.J. separately reported to the forensic medical examiner that she suffered from an ongoing ankle injury as the result of Father's " 'body-slamming' " her. And Father admitted that on at least one occasion he physically struck J.J. as a form of discipline. This was substantial evidence upon which the juvenile court

11

could rely to conclude that Father directly participated in at least some of the physical abuse perpetrated against J.J.[4]

Moreover, abuse perpetrated by omission is not limited to situations in which a parent fails to prevent physical abuse by another. California cases have recognized that it is possible for a parent to be considered a direct perpetrator of abuse where a parent increases the injury or suffering of the child by making a conscious decision not to seek medical treatment after an injury has been discovered. (*Pablo S. v. Superior Court* (2002) 98 Cal.App.4th 292, 301 [A "parent's failure to provide medical attention" can constitute "the infliction of serious injury by omission" where there is no good explanation for a parent's failure to act.]; see *J.J.*, *supra*, 81 Cal.App.5th at p. 457 [Even where there is insufficient evidence to show a parent consented to abuse by another, a parent's failure to seek medical attention after the abuse has occurred may be a basis for finding the parent contributed to inflicting serious physical injury.].)

Here, the evidence showed that J.J. had numerous scars on her feet, legs, and knees that were obvious and clearly observable. A police detective and social worker

---

[4] It is true that in later interviews, J.J. recanted her accusation against Father and Father sought to minimize the extent of any injury caused by his prior act of physical discipline. However, "[c]ourts evaluating abuse allegations must keep in mind that a child's verbal and cognitive limitations may prevent her from providing an account of her abuse that is as coherent and consistent as we might expect from an adult"; and, "[a] child's account may reflect uncertainty, and may even contain some contradictions, and nevertheless warrant the court's trust." (*In re I.C.* (2018) 4 Cal.5th 869, 896.) Even under the clear and convincing standard, we give deference to how the juvenile court may have resolved conflicts in the evidence and do not reweigh the evidence or exercise independent judgment if there are sufficient facts to support the findings. (*In re K.M.* (2024) 102 Cal.App.5th 910, 914.)

were able to clearly observe the injuries when first encountering J.J.; a medical doctor diagnosed at least one injury as a burn; and the forensic medical examiner opined that the extensive nature and symmetrical appearance of the injuries suggested they were not self-inflicted. Further, the juvenile court was provided photographs of the injuries taken on the date of the initial response referral, such that the juvenile court could see for itself the extent of the injuries and scars on J.J. and conclude that the injuries were obvious and sufficiently serious that they suggested the need for medical attention. Father admitted that he never sought medical treatment on behalf of J.J. at any time prior to being instructed to do so by a social worker. And the evidence showed that J.J.'s injuries were in the process of healing by the time CFS intervened, suggesting J.J. had suffered some length of time without medical attention as a result of her injuries. The only reason offered by Father for his failure to seek medical treatment was to deny J.J. had any injuries at all.

Thus, there was substantial evidence upon which the juvenile court could rely to conclude that, in addition to directly inflicting physical injury upon J.J., Father was a direct perpetrator of abuse because J.J. also suffered serious physical injury and serious emotional damage within the meaning of section 361.5, subdivision (b)(6)(C), as a result of Father's own decision to forego seeking medical treatment for otherwise clearly observable injuries to J.J. Because substantial evidence in the record supports the juvenile court's express finding that Father was a direct perpetrator of physical abuse within the meaning of section 361.5, subdivision (b)(6), we need not separately consider whether substantial evidence also supported the juvenile court's additional finding that

13

the bypass provision should apply because Father failed to protect J.J. from abuse inflicted by C.B.

C. *The Juvenile Court's Best Interest Finding Is Supported by Substantial Evidence*

Father also contends that substantial evidence did not support the juvenile court's finding that it would not benefit J.J. to pursue reunification services. We disagree.

Generally, in determining whether reunification services will benefit a dependent child, "the juvenile court 'shall consider any information it deems relevant, including . . . [¶] (1) [t]he specific act or omission comprising the . . . severe physical harm inflicted on the child . . . (2) [t]he circumstances under which the abuse or harm was inflicted . . . ; [¶] (3) [t]he severity of the emotional trauma suffered by the child . . . ; [¶] (4) [a]ny history of abuse of other children by the offending parent . . . ; [¶] (5) [t]he likelihood that the child may be safely returned to the care of the offending parent . . . within 12 months with no continuing supervision [and] [¶] (6) [w]hether or not the child desires to be reunified with the offending parent." (*In re A.M.* (2013) 217 Cal.App.4th 1067, 1075; § 361.5, subd. (i).)

In this case, J.J. had resided with Father for approximately three years before being detained.[5] J.J. expressed that she had no interest in reunifying with Father; consistently refused to participate in any in-person visits with Father in the 11 months between her initial detention and the dispositional hearing; and refused to engage in any meaningful communications with Father during this period.

---

[5] Father reported that J.J. began living with him sometime in 2020 before being detained in 2023.

More importantly, Father consistently denied that J.J. suffered any significant injuries and continued that assertion in his stipulated testimony. A parent's consistent denial that any abuse has occurred raises a strong inference that there is no basis to conclude that reunification is possible. (*In re A.M.*, *supra*, 217 Cal.App.4th at pp. 1077-1078 ["[T]here are no services that will prevent reabuse by a parent who refuses to acknowledge the abuse in the first place."]; *In re A.E.* (2019) 38 Cal.App.5th 1124, 1145 [The parents' "ongoing insistence that all of the physical abuse allegations were false" leads to the reasonable conclusion that reunification was not likely and not in the child's best interest.].) Given J.J.'s express desire not to reunify with Father; J.J.'s unwillingness to participate in any meaningful engagement with Father; and Father's repeated refusal to even admit that J.J. ever suffered any abuse, we conclude that substantial evidence in the record supports the juvenile court's finding that pursuit of reunification services would not benefit J.J.

## IV.  DISPOSITION

The dispositional order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS                 
J.

We concur:


MILLER               
          Acting P. J.


MENETREZ            
             J.